**NORTHSIDE LINCOLN MERCURY, INC., Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

**Civ. No. 4–82–1552.**

United States District Court,
D. Minnesota,
Fourth Division.

Sept. 30, 1983.

David R. Knodell, and Wayne H. Olson, Olson, Gunn, & Seran, Ltd., Minneapolis, Minn., for plaintiff.

Peter Dorsey, and Robert Bayer, Dorsey & Whitney, Minneapolis, Minn., for defendant.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

This case was tried before the court without a jury for five days. The court, having considered the evidence produced at trial and having observed the demeanor of the witnesses and considered their credibility and experience, hereby enters its findings of fact and conclusions of law in memorandum form pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Plaintiff, Northside Lincoln Mercury, Inc. (Northside), a Lincoln Mercury dealer located at 800 West Broadway in Minneapolis, brought this action for damages and injunctive relief against defendant Ford Motor Company (Ford), the manufacturer of Lincoln and Mercury automobiles. Jurisdiction is pursuant to 28 U.S.C. § 1332.

Northside alleges that Ford has violated the Minnesota Motor Vehicles Sale and Distribution Regulations (the Act), Minn.Stat. § 80E.01, *et seq.*, by opening and operating a Lincoln Mercury dealership within ten miles of Northside without "good cause" as defined in § 80E.14 subd. 2.[1] Northside and Ford have a sales and service agreement which is a franchise within the meaning of the Act. Minn.Stat. § 80E.03 subd. 8.

In June of 1980, five Lincoln Mercury dealers operated in the Minneapolis-St. Paul area.[2] Ford treats Minneapolis and St. Paul as separate markets for both Lincoln and Mercury. Northside, Quality Lincoln Mercury in Bloomington, and Prestige Lincoln Mercury in St. Louis Park operated in the Minneapolis market. Capp Lincoln Mercury (Capp) on University Avenue in St. Paul and White Bear Lincoln Mercury in White Bear Lake operated in the St. Paul market. Capp terminated its franchise and ceased operation in June, 1980. The other four dealerships remain in operation.

Ford began efforts to obtain another dealer for the Capp location shortly after Capp closed. On June 1, 1982, Ford gave written notice to Northside that it intended to reopen the Capp location "as soon as we have located a qualified replacement dealer."

Northside pursued an appeal of this decision by Ford pursuant to the procedures set forth in their agreement. On October 22, 1982, the Ford Dealer Policy Board denied the appeal and decided the replacement of the Capp dealership should go for-

---

**1.** Specifically, the Act prohibits the establishment of a new dealership within a relevant market area where the line make is then represented unless good cause is established. The relevant market area is a radius of ten miles around an existing dealership. Minn.Stat. § 80E.14 subd. 1.

**2.** For at least fifteen years prior to 1980, Ford had five Lincoln Mercury or Mercury dealerships in the Minneapolis-St. Paul area. Beginning in 1978, all dealerships had sales and service agreements for both the Lincoln and Mercury lines.

ward. Northside commenced this suit on November 5, 1982.[3]

Also in November of 1982, Harvey and Mark Wilkens signed a sales and service agreement to open at the former Capp location as Wilkins Lincoln Mercury. Harvey Wilkins has many years of experience in the Twin Cities selling automobiles and running different dealerships. Wilkins Lincoln Mercury was completely open for business in January, 1983.

The issue at trial[4] was whether Ford had good cause within the meaning of the Act to open the Wilkins dealership at the Capp location. Minn.Stat. § 80E.14 subd. 2 provides that the following factors are among those to be considered in determining whether such good cause has been established:

(1) The permanency of the investment;

(2) The effect on the retail new motor vehicle business and the consuming public in the relevant market area (the relevant market area is a radius of ten miles around an existing dealership, Minn.Stat. § 80E.14 subd. 1);

(3) Whether it is injurious to the public welfare for an additional new motor dealership to be established;

(4) Whether the new motor vehicle dealers of the same line make in that relevant market area are providing adequate competition and convenient consumer care for the motor vehicles of the line make in the market area including the adequacy of motor vehicle sales and service facilities, equipment, supply of motor vehicle parts, and qualified service personnel;

(5) Whether the new motor vehicle dealers of the same line make in the relevant market area are providing adequate market penetration and representation; provided, that good cause shall not be shown solely by a desire for further market penetration;

(6) Whether the establishment of an additional new motor vehicle dealership would increase competition, and therefore be in the public interest; and

(7) The growth or decline in population and new car registrations in the relevant market area.

With respect to the first factor to be considered under the Act, the record indicates that Harvey and Mark Wilkins have made a substantial, good faith investment of a permanent nature in their dealership.[5] They have made a significant capital investment in the new dealership. Ford requires $462,000 capitalization. The great majority of this investment was obtained through loans personally guaranteed by Harvey Wilkins or from the Wilkins' personal funds. Approximately $100,000 was spent on equipment for the new dealership. Harvey Wilkins also testified that the Wilkins intend to renegotiate and renew their sublease in 1986 in order to stay at their present location.[6] He testified that the location of the property on the oldest established auto row in St. Paul makes it desirable to stay. An auto row consists of an area where several automobile dealers of different lines are clustered together.

3. Northside initially brought this action in state court. Ford removed it to this court.

4. In a decision and order dated April 7, 1983, denying both Northside's motion for a preliminary injunction and Ford's motion for summary judgment, this court found that this action is timely under Minn.Stat. § 80E.14 subd. 1 and that the Wilkins opening was not a reopening of a preexisting dealership within the meaning of that section.

5. While it is not entirely clear which investment is to be judged for permanency, the better view appears to be that the statute refers to the investment of the new dealership. However, if Northside's investment is to be examined, certain facts should be noted. Some of Northside's property was taken in a 1981 condemnation proceeding during which Northside indicated that it would have to relocate as a result. Other evidence indicated that Northside desires to move to the suburbs. Northside has also scaled down its automobile dealership since the condemnation; one floor of its facility previously used as an automobile showroom is now used as a showroom for the sale of boats.

6. The Wilkins sublease the property on which the dealership is located from Ford. This sublease provides for the first of three renewal periods in 1986.

There was testimony that consumers generally shop at a number of dealerships and are attracted by the convenience of auto rows.

The court is not persuaded by Northside's argument that the Wilkins ultimately intend to relocate in the St. Paul suburb of Roseville and that the opening of the Capp location was a ploy to avoid the Act when later relocating. Harvey Wilkins, S.H. Hilleboe (manager of market statistics for Ford) and W.D. Neal (Ford's district sales manager) all testified that a relocation is not being planned. Moreover, if such a relocation were the ultimate intention of Ford or Wilkins, they could have avoided the Act altogether by opening the Lincoln Mercury dealership outside of Northside's relevant market area. (The Capp location is in fact not to far from its boundaries.)

With respect to the second factor under the Act, the record shows that the opening of the Wilkins dealership will generally stimulate the retail automobile business. Advertising placed by Wilkins for Lincoln Mercury products will generally help Lincoln Mercury sales at all dealerships. Moreover, the opening of the Wilkins dealership rids the University Avenue auto row of the boarded up Capp dealership. This blight did not enhance the image or business of that auto row or generate confidence in the automobile industry in general.

As to the third factor to be considered under the Act, the court finds no reason to conclude that the establishment of the Wilkins dealership is injurious to the public welfare. On the contrary, the opening of a new business which provides jobs and generates sales and property taxes is of general benefit to the public. More specifically, the establishment of the Wilkins dealership benefits those living in the southern and eastern portions of St. Paul. That segment of the population has had no convenient access to Lincoln Mercury sales and service since the Capp closing. (The White Bear dealership is located in the northern extreme of the St. Paul market, north of the city limits.)

With respect to the fourth factor under Minn.Stat. 80E.14 subd. 2, little evidence was produced on the issue of whether Northside provided adequate competition and convenient consumer care for those in its relevant market area. It is clear, however, that Northside has consistently made private sales in its area even though the number has fallen off since 1979 and is less than at other dealerships.

As to the factor of market penetration, statistics presented by S.H. Hilleboe, manager of market statistics for Ford, demonstrate that since the Capp closing there has been a drop in Lincoln and Mercury market penetration in the Northside relevant market area. Although Lincoln Mercury sales dropped nationwide after 1979 due to high interest rates and gasoline prices, the penetration levels in the Northside relevant market area are below Lincoln Mercury's national average and the levels in the other Twin Cities dealers' market areas as defined by Ford. Moreover, the market penetration rates for the Twin Cities area as a whole are below the nation average. These statistics support Ford's position that another dealer was needed in the Twin Cities area.

With respect to the sixth element under the Act, several factors indicate that the opening of the Wilkins dealership will increase competition and therefore be in the public interest. Hilleboe testified that all of Lincoln Mercury's primary competitors have two dealerships in the St. Paul market. He noted that no other similar size market in the nation has only one Lincoln Mercury dealership. The opening of the Wilkins dealership establishes a Lincoln Mercury dealer on the University Avenue auto row, St. Paul's oldest. Finally, and most importantly, the Wilkins dealership will enhance Lincoln Mercury's competitive standing in southern and eastern St. Paul, which was without a Lincoln Mercury dealer near it since the Capp closing.

Consideration of the growth or decline in population and new car registrations in the Northside relevant market area, the final factor under the statute, indicates further

cause for opening the Wilkins dealership. The population of car buying age increased between 1970 and 1980, as did the population with income above $15,000. Most significantly, the number of households in the Northside relevant market area, the car buying unit, also increased by 12.4% from 1970 to 1980. While new car registrations declined generally after 1978–79, this was part of a national slump.

Other relevant factors also support a finding of good cause. Of particular significance in this case is the fact that, although Northside and Wilkins are within ten miles of each other, they seem to serve different markets. This conclusion is based both on statistics supplied by Ford and Twin Cities traffic and commerce patterns. Northside's own statistics affirm this conclusion; they indicate that Northside sold a relatively insignificant number of cars into the primary market area served by the Capp facility as determined by Ford, and that the number of such sales did not change significantly after the closing of Capp.[7] Thus it appears that the opening of Wilkins has not and will not significantly affect Northside's level of sales in the primary market area formerly served by Capp. The number of sales lost in any event would be relatively insignificant.

It is also noteworthy that neither the White Bear nor the Quality Lincoln Mercury dealerships, both located within ten miles of Wilkens, objected to the establishment of the Wilkins dealership. White Bear's silence is especially significant because it is even closer to Wilkins than Northside and is located in the St. Paul market, unlike Northside.

Finally, Northside argues that the Wilkins only opened the Lincoln Mercury dealership there as a means of obtaining the site for their Toyota dealership. However, Wilkins sold approximately 92 Lincolns and Mercurys in its first five and a half months

of operation. *See* Harvey Wilkins deposition, p. 49. Moreover, if the Wilkins were not serious about selling Lincolns and Mercurys, then it would seem to follow that any alleged threat to Northside's business would also not be serious.

In sum, a variety of factors, including the need for a dealership convenient to southern and eastern St. Paul, the existence of an established auto row on University Avenue which serves this area, and the different markets served by Northside and Wilkins, all combine to establish good cause for the opening of the Wilkins dealership.

Ford argues that Northside commenced and prosecuted this action in bad faith, thereby entitling Ford to the full amount of its costs, disbursements and attorney's fees pursuant to Minn.Stat. § 549.21. It asserts that Northside brought this action solely to increase its award in the condemnation proceedings: first, by using the action as evidence that it intended to stay at its present facility, and, second, by forcing Ford to assist in the condemnation proceeding. The court is not persuaded that this action was brought or maintained in bad faith, however, and Ford's request should be denied.

### ORDER

Accordingly, based upon all the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT

1. Judgment on the complaint be entered in favor of the defendant.

2. Defendant is entitled to its ordinary costs, but its request for full litigation costs, disbursements, and attorney's fees pursuant to Minn.Stat. § 549.21 is denied.

---

**7.** *See* Northside's Response to Defendant's First Request for Admissions and Interrogatories, Set II, # 68. Northside's records show ten sales into the Capp primary market area in 1978, sixteen in 1979, seventeen in 1980, sixteen in 1981, and sixteen in 1982. Although A.C. Ellingson offered statistics at trial contrary to these admissions, the boundaries he used in compiling his statistics were inaccurate and his testimony was impeached in several respects.