103 Cal.App.3d 412 (1980)
163 Cal. Rptr. 41
ALBERT PIANO, Plaintiff and Appellant,
v.
THE STATE OF CALIFORNIA ex rel. NEW MOTOR VEHICLE BOARD, Defendant and Respondent; NISSAN MOTOR CORPORATION, Real Party in Interest and Respondent.
Docket No. 56387.
Court of Appeals of California, Second District, Division Three.
March 13, 1980.
*414 COUNSEL
Sidney I. Pilot, A. Albert Spar and Dean O. Isaacs for Plaintiff and Appellant.
George Deukmejian, Attorney General, and Richard M. Radosh, Deputy Attorney General, for Defendant and Respondent.
O'Melveny & Myers, Donald M. Wessling and Gregory R. Oxford for Real Party in Interest and Respondent.
OPINION
KLEIN, P.J.
Appellant Albert Piano, doing business as Al Piano Datsun (Piano), appeals from a superior court judgment entered January 12, 1979, denying petitions for writs of mandate (Code Civ. Proc., § 1085)[1] and administrative mandamus (Code Civ. Proc., § 1094.5).[2]
Piano prayed for a writ of mandate in the superior court ordering respondent State of California, by and through the New Motor Vehicle Board (Board) to set aside its decision on Piano's protest, and enter an order not permitting real party in interest Nissan Motor Corporation in U.S.A. (Nissan) to establish a dealership. Piano also requested the court to mandate the Board to promulgate meaningful standards relating *415 to "good cause" under Vehicle Code section 3063[3] through rules and regulations.

BACKGROUND INFORMATION
On November 30, 1977, Nissan gave notice pursuant to section 3062[4] of its intention to establish another Datsun motor vehicle dealership in Simi Valley. On December 12, 1977, Piano, who had the Piano Datsun dealership in Thousand Oaks, some 12 miles distant, filed a protest with the Board.
A hearing was held between March 21 and March 31, 1978, pursuant to section 3066[5] before a hearing officer, during which 15 witnesses *416 testified and 83 exhibits were introduced. The hearing officer's proposed decision recommended that the protest be overruled. On June 30, 1978, the Board unanimously adopted the proposed decision.
In determining the issue of good cause in all 5 categories as required by section 3063, the hearing officer made 46 findings of fact, unchallenged on this appeal.
A trial was had in the superior court pursuant to the petitions for writs on November 17, 1978, wherein the protest hearing transcript and exhibits were admitted in evidence and oral arguments were heard. The trial judge denied the writ of mandate on the ground that the issuance of regulations under sections 3050, subdivision (a),[6] 3062 and/or 3063 was not a ministerial act which the law specifically enjoined, and denied the writ of administrative mandamus (review) on the grounds that there was substantial evidence to support the findings of the Board, that the Board's decision was supported by the findings, and that Piano's claims as to jurisdiction and abuse of discretion were without merit as a matter of law.

CONTENTIONS
Piano contends that he was denied basic fairness and due process because the five specific factors set out in section 3063 did not provide adequate standards to guide the Board in determining whether "good cause" existed, and that judicial review is therefore impossible. He also avers that mandate is the proper remedy to compel the Board to promulgate regulations clarifying section 3063.
We disagree with Piano's contentions and affirm the ruling of the superior court for the reasons hereinafter discussed.

STATUTORY SCHEME
Pursuant to the statutory scheme, the statewide Board is empowered to hear and consider protests by existing motor vehicle dealers against the franchising of additional dealerships of the "same line-make."
*417 An automobile manufacturer, before establishing a new dealership, is required to serve written notice on each of its existing dealers located within a proscribed radius of the proposed dealership. Within 15 days, any such dealer may file a "protest," the automatic effect of which is to enjoin the manufacturer from franchising the new dealership until a hearing is held.
If the protesting dealer proves at the hearing that there is "good cause for not permitting" the new dealership, the Board may prohibit it permanently. "Good cause" is defined in section 3063.
The Board customarily appoints a hearing officer to hear the evidence and prepare a proposed decision. The Board's decision must be in writing and contain findings of fact and a determination of the issues presented. Either party may seek judicial review.
It would appear that by the adoption of the above set forth statutory scheme the Legislature intended that the Board balance the dealers' interest in maintaining viable businesses, the manufacturers' interest in promoting sales, and the public's interest in adequate competition and convenient service.

DISCUSSION
(1) In applying the statutory scheme to Piano, we reject his first contention in that we determine the standards set forth in section 3063 are adequate to guide those persons to be governed thereby, whether such persons be litigants, hearing officers, the Board, or judges.
California law has upheld standards far less specific than the section 3063 "good cause" factors. For example, Unemployment Insurance Code section 1256, providing that a person is disqualified for benefits if the director finds he left his most recent work "voluntarily without good cause" (italics added), has been upheld. Sanchez v. Unemployment Ins. Appeals Bd. (1977) 20 Cal.3d 55, 69-70 [141 Cal. Rptr. 146, 569 P.2d 740]; Syrek v. California Unemployment Ins. Bd. (1960) 54 Cal.2d 519, 529-532 [7 Cal. Rptr. 97, 354 P.2d 625]; Rabago v. Unemployment Insurance Appeals Board (1978) 84 Cal. App.3d 200, 208-209 [148 Cal. Rptr. 499]. "Good cause" was defined by the California Supreme Court as "`an adequate cause, a cause that comports with the purposes of the Unemployment Insurance Code and with other laws....'" *418 (Syrek v. California Unemployment Insurance Board, supra, 54 Cal.2d, at p. 529.)
In City & County of S.F. v. Superior Court (1959) 53 Cal.2d 236 [1 Cal. Rptr. 158, 347 P.2d 294], the Supreme Court found "completely devoid of merit" a constitutional challenge to agency denial of a building permit under an overall standard of "`promotion of public health, safety, comfort, convenience and general welfare,' in the light of existing and effective city ordinances prescribing express or minimum standards." (Id., at pp. 249-250.)
In Jenner v. City Council (1958) 164 Cal. App.2d 490, 498 [331 P.2d 176], a statute providing that "any land which in the judgment of the legislative body will not be benefited shall not be included in [a special parking] district," was found to provide adequate standards.
The court went on to make observations particularly pertinent to the relatively detailed language of section 3063 as follows: "[F]urther refinement of this criteri[a] would serve no useful purpose for it too would be subject to the same argument that plaintiffs are now making unless it was so detailed as to restrict the exercise of any real judgment by [the agency.] This latter result would subvert the very purpose behind the delegation of authority, viz., leaving the determination to those who are acquainted with the individual and varying local conditions. Furthermore, what might be considered a benefit in one case could well be a detriment in another, and this fact militates against the fixing of any rigid standard." (Id., at p. 499.)
Section 3063 requires the Board to "take into consideration the existing circumstances, including, but not limited to:" five specific areas of inquiry.[7] The factors are detailed and comprehensive; if they were any more specific, they would be subject to criticism as being "... so detailed as to restrict the exercise of any real judgment by the local authorities." (Jenner, supra, at p. 499.)
The hearing officer and the litigants apparently had no difficulty following the section 3063 guidelines, as evidenced by the number and specificity of the findings. A lengthy hearing was had with 15 witnesses testifying and 83 exhibits received. The hearing officer made copious *419 factual findings in each of the five subdivisions in pursuance of the purpose of the statutory scheme.
In the light of Piano's claims, we examine the following:

"Findings Relating to Permanency of Investment (§ 3063(1))
"5. Piano has been a franchised Datsun dealer since August, 1972, and has been located [in] Thousand Oaks ... since 1974. Piano is also a Honda franchisee.
"6. Piano has a substantial permanent investment at its present location. The Piano facilities are valued at over one million dollars.
".... .... .... ...
"8.... . The nearest Datsun dealers are in Oxnard ... and in Woodland Hills, approximately 13 miles away from Piano.
".... .... .... ...
"10. The projected population growth [rate] for Thousand Oaks ... is ... [at] an average annual increase of 5.6%.
"11. Piano's return on investment is higher than he anticipated when purchasing the Datsun franchise in 1972.
"12. If an additional Datsun dealer is established in Simi Valley, Piano will likely still be profitable and have a substantial return on his investment.
".... .... .... ...

"Findings Relating to the Effect on the Retail Motor Vehicle Business and the Consuming Public in the Relevant Market Area (§ 3063(2))
"14. The straight line distance from Piano's location to the proposed new dealership is over nine miles and by the shortest surface route over 12 miles.
*420 "15. The proposed dealership is in the west end of Simi Valley and most of the population of Simi Valley is to the east of the proposed dealership, therefore, more than ten miles from Piano's location.
".... .... .... ...
"17. Piano's location is in a direction away from the areas wherein most Simi Valley residents work.
"18. There is a range of hills between Simi Valley and Thousand Oaks.
"19. A new freeway will join Simi Valley to the San Fernando Valley.
"20. The proposed new dealer in Simi Valley anticipates a substantial permanent investment.
".... .... .... ...

"Findings Relating to the Effect on the Public Welfare (§ 3063(3))
"23. Simi Valley lacks commercial operations and thus a source of revenue; there is high unemployment there.
"24. Commercial growth should be encouraged in Simi Valley  specifically, a new auto dealership  [is] in the public interest by generating revenue for the City, creating jobs, and reducing the loss of sales.
".... .... .... ...

"Findings Relating to Adequate Competition and Convenient Consumer Care (§ 3063(4))
".... .... .... ...
"32. While Piano's total annual Datsun sales increased from 561 to 568 ... from 1974 to 1977 its sales in Simi Valley decreased from 110 to 103.... Piano's percentage of sales to Simi Valley decreased from 19.6% to 18.1%.
*421 "33. From 1974 to 1977, ... [¶] Piano's [s]hare of the Simi Valley Datsun market ... decreased 40.3% and San Fernando Valley dealers' share increased 40.6%.
".... .... .... ...
"37. From 1975 to 1977, Piano's annual sales decreased from 743 to 619 (-16.7%), Datsun district sales increased from 9,693 to 12,910 per year (+33.2%), and Datsun region sales increased from 56,493 to 81,466 per year (+44.2%).
".... .... .... ...
"42. In both 1976 and 1977 Nissan expressed dissatisfaction with Piano's sales and performance.
"43. Piano's location is not convenient for Simi Valley residents, being more than ten miles from most of Simi Valley.

"Findings Relating to Increased Competition and the Public Interest (§ 3063(5))
"44. Datsun car sales in Simi Valley decreased from 13.9% of industry in 1975 to 8.8% in 1977.
".... .... .... ...
"46.... [¶] Piano's share of Simi Valley Datsun market decreased 40.3% from 1974 to 1977."
From these findings of fact, the hearing officer concluded: "Piano has failed to establish that good cause exists for not permitting the establishment of the additional dealership for the following reasons:
"(a) The additional dealership will not jeopardize the permanent investment of Piano. Substantial business opportunities exist and will increase in the Thousand Oaks and adjacent areas. (¶ 4(a).)
"(b) The additional dealership will not adversely affect the retail motor vehicle business and the consuming public in the relevant market area. The demographics are favorable to a new dealership in Simi Valley. (¶ 4(b).)
*422 "(c) It will [not] injure the public welfare to establish the additional franchise. A new dealership is economically desirable for Simi Valley. (¶ 4(c).)
"(d) The franchise of the same line-make in the relevant market area is not providing adequate competition and convenient consumer care for the motor vehicles of the line-make in the relevant market area because of Piano's decreased efforts, reduced sales results, and distance from Simi Valley. (¶ 4(d).)
"(e) The establishment of the additional franchise will increase competition and therefore be in the public interest. The sales in Simi Valley by the nearest Datsun dealer  Piano  can be improved upon by a dealer in Simi Valley, which dealer will also be more convenient for Simi Valley residents. (¶ 4(e).)"
The ready and thorough application of section 3063 standards to the fact situation herein bolsters our conclusion that the administrative standards as to the meaning of "good cause" are sufficiently adequate to withstand due process scrutiny. (New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co. (1978) 439 U.S. 96, 106-107 [58 L.Ed.2d 361, 373-374, 99 S.Ct. 403].) The findings made pursuant to such standards therefore present an appropriate record for appellate review, and upon review we uphold the ruling of the trial judge that there was substantial evidence to support the findings of the Board and that the Board's decision was supported by the findings.
(2) Piano received notice of the hearing, was in fact represented by counsel at the hearing, and his "protest" was thoroughly litigated pursuant to adequate administrative standards. Piano was thus afforded basic fairness and due process. (Drummey v. State Bd. of Funeral Directors (1939) 13 Cal.2d 75, 80-81 [87 P.2d 848].)
As to Piano's other major contention, to the extent that Code of Civil Procedure section 1085 is the appropriate remedy to compel an agency to act, where there is such a duty to act, as we have previously indicated there was no necessity for the Board "to act" in this case. (3) "`A writ of mandamus will issue only against a[n] ... inferior tribunal "to compel the performance of an act which the law specifically enjoins" upon such [tribunal].'" (Valley Motor Lines, Inc. v. Riley (1937) 22 Cal. App.2d 233, 237 [70 P.2d 672].)
*423 Nor does the use of the language "shall [instead of may]: Adopt rules and regulations" found in section 3050, subdivision (a), expressly require the Board to issue substantive requirements to make even more specific section 3063's detailed "good cause" factors. Section 3050, subdivision (a) contains no requirement that the Board promulgate any particular type of regulations or that they concern any particular statutory section. To the contrary, the Government Code provisions, Government Code section 11371, subdivision (b),[8] to which section 3050, subdivision (a) refers, define "regulations" as either substantive or procedural. Indeed, the Board herein has adopted numerous procedural regulations. (Cal. Admin. Code, tit. 13, ch. 1, subch. 2.)
Piano had a fair hearing within the clear guidelines as set down by section 3063. Since there is no duty on the Board to promulgate regulations clarifying section 3063, mandate does not lie.
Although we have found Piano's arguments unpersuasive, and reasonable minds could conclude that some of his legal actions were dilatory in nature, we do not view his appeal as an abuse of process as Nissan asserts, and therefore we do not impose sanctions against Piano.
The judgment is affirmed.
Cobey, J., and Allport, J., concurred.
NOTES
[1] Code of Civil Procedure section 1085 provides in pertinent part: "It may be issued by any court, ... to any inferior tribunal, ... to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station; ..."
[2] Code of Civil Procedure section 1094.5 provides in pertinent part: "(a) Where the writ is issued for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in the inferior tribunal, corporation, board or officer, the case shall be heard by the court sitting without a jury. All or part of the record of the proceedings before the inferior tribunal, corporation, board or officer may be filed with the petition, may be filed with respondent's points and authorities or may be ordered to be filed by the court....

"(b) The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."
[3] Vehicle Code section 3063 provides: "In determining whether good cause has been established for not entering into or relocating an additional franchise for the same line-make, the board shall take into consideration the existing circumstances, including, but not limited to:

"(1) Permanency of the investment.
"(2) Effect on the retail motor vehicle business and the consuming public in the relevant market area.
"(3) Whether it is injurious to the public welfare for an additional franchise to be established.
"(4) Whether the franchisees of the same line-make in that relevant market area are providing adequate competition and convenient consumer care for the motor vehicles of the line-make in the market area which shall include the adequacy of motor vehicle sales and service facilities, equipment, supply of vehicle parts, and qualified service personnel.
"(5) Whether the establishment of an additional franchise would increase competition and therefore be in the public interest."
Hereinafter all statutory references are to the California Vehicle Code, unless otherwise stated.
[4] Vehicle Code section 3062 provides in pertinent part: "(a) Except as otherwise provided in subdivision (b), in the event that a franchisor seeks to enter into a franchise establishing an additional motor vehicle dealership within a relevant market area where the same line-make is then represented, or relocating an existing motor vehicle dealership, the franchisor shall in writing first notify the board and each franchisee in such line-make in the relevant market area of his intention to establish an additional dealership or to relocate an existing dealership within or into that market area. Within 15 days of receiving such notice or within 15 days after the end of any appeal procedure provided by the franchisor, any such franchisee may file with the board a protest to the establishing or relocating of the dealership. When such a protest is filed, the board shall inform the franchisor that a timely protest has been filed, that a hearing is required pursuant to Section 3066, and that the franchisor shall not establish or relocate the proposed dealership until the board has held a hearing as provided in Section 3066, nor thereafter, if the board has determined that there is good cause for not permitting such dealership. In the event of multiple protests, hearings may be consolidated to expedite the disposition of the issue."
[5] Vehicle Code section 3066 states: "(a) Upon receiving a notice of protest pursuant to Section ... 3062 ... the board shall fix a time, which shall be within 60 days of such order, and place of hearing and send ... a copy of the order to the franchisor, the protesting franchisee, and all [others who] requested notification by the board of protests and decisions of the board...."
[6] Vehicle Code section 3050, subdivision (a) provides: "The board shall:

"(a) Adopt rules and regulations in accordance with the provisions of Chapter 4.5 (commencing with Section 11371), Part 1, Division 3, Title 2 of the Government Code governing such matters as are specifically committed to its jurisdiction."
[7] See footnote 3, ante, page 415.
[8] Government Code section 11371, subdivision (b) states: "`Regulation' means every rule, regulation, order, or standard of general application or the amendment, supplement or revision of any such rule, regulation, order or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, ..." (This section in its exact form becomes § 11342, subd. (b) as of July 1980.)