MONMOUTH CHRYSLER–PLYMOUTH, INC., PETITIONER-RE-
SPONDENT, v. CHRYSLER CORPORATION, RESPONDENT-
APPELLANT, AND RITTENHOUSE LINCOLN-MERCURY,
INC., INTERVENOR-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued June 4, 1985—Decided July 26, 1985.

Before Judges ANTELL, J.H. COLEMAN and SIMPSON.

*Dennis R. LaFiura* argued the cause for appellant Chrysler Corporation (*Pitney, Hardin, Kipp & Szuch,* attorneys; *Clyde A. Szuch* on the brief).

*Martin J. McGreevy* argued the cause for intervenor-appellant Rittenhouse Lincoln-Mercury, Inc. (*Carton, Nary, Witt & Arvanitis,* attorneys; *James R. Gorman* on the brief).

*Liliann Messina Nugent* argued the cause for respondent Monmouth Chrysler-Plymouth, Inc. (*Wilentz, Goldman & Spitzer,* attorneys; *Warren W. Wilentz,* of counsel and *Ms. Nugent* on the brief).

The opinion of the court was delivered by,

ANTELL, P.J.A.D.

This is an appeal by respondent Chrysler Corporation (hereinafter "Chrysler") and intervenor Rittenhouse Lincoln-Mercury, Inc. (hereinafter "Rittenhouse") from a determination by the Motor Vehicle Franchise Committee of the Department of Law and Public Safety precluding Chrysler from enfranchising Rittenhouse as a Chrysler and Plymouth dealer. The decision of the Committee, which affirmed the findings and conclusions of an Administrative Law Judge (hereinafter "ALJ"), upheld the protest of Monmouth Chrysler-Plymouth, Inc. (hereinafter "Monmouth"), an existing Chrysler franchisee.

Under *N.J.S.A.* 56:10–17 the Motor Vehicle Franchise Committee (hereinafter "Committee") was created to adjudicate disputes between motor vehicle franchisors and franchisees concerning the establishment of new motor vehicle dealerships within a given geographical area. *N.J.S.A.* 56:10–19 obliges motor vehicle franchisors to give its existing franchisees "in the same line make within the relevant market area 90 days'

advance written notice of its intention to grant, relocate, reopen or reactivate a franchise of the same line make...." The "relevant market area" is defined by *N.J.S.A.* 56:10–16f as "a geographic area 8 miles in radius from a proposed franchise or business...." Within 30 days after receiving the franchisor's notice, or within 30 days after the end of any appeal procedure provided by the franchisor, any franchisee entitled to receive the notice may file a protest with the Committee, setting forth all reasons for its objection. To guide the Committee in determining the merits of the protest after a hearing, *N.J.S.A.* 56:10–18 provides that:

> No motor vehicle franchisor shall grant, relocate, reopen or reactivate a business, for the purpose of doing business on the retail level, if the franchise or business will be injurious as determined pursuant to section 8 of this act.

Section 8 of the act is found in *N.J.S.A.* 56:10–23. It provides:

> In determining whether the grant, relocation, reopening or reactivation of a franchise or establishment, relocation, reopening or reactivation of a business will be injurious to existing franchisees and to the public interest, the committee may consider, but shall not be limited to considering the following:
>
> a. The effect that the proposed franchise or business would have on the provision of stable, adequate and reliable sales and service to purchasers of vehicles in the same line make in the relevant market area;
>
> b. The effect that the proposed franchise or business would have on the stability of existing franchisees in the same line make in the relevant market area;
>
> c. Whether the existing franchisees in the same line make in the relevant market area are providing adequate and convenient consumer service for motor vehicles of the line make in the relevant market area, which shall include the adequacy of motor vehicle sales and service facilities, equipment, supply of motor vehicle parts and qualified service personnel;
>
> d. The effect on a relocating dealer of a denial of its relocation into the relevant market area.

On July 6, 1983 Chrysler notified Monmouth, a Chrysler-Plymouth dealer since April 1967, of its intent to enfranchise Rittenhouse in Asbury Park, 4.25 miles from Monmouth's location in Eatontown. The purpose of the new dealership was to fill a vacancy created in 1979 when another Chrysler dealership in Belmar went out of business. Monmouth filed its protest August 2, 1983 which, pursuant to *N.J.S.A.* 56:10–19, was then transmitted by the committee chairman to the Office of Admin-

istrative Law for hearing. The initial decision of the ALJ was filed December 6, 1983 and the Committee's decision and order were filed February 24, 1984. In adopting the ALJ's recommendation the Committee concluded "that sufficient credible evidence exists to support the Administrative Law Judge's determination that petitioner would be injured by the establishment of the Rittenhouse dealership."

The conclusion articulated by the ALJ was that Monmouth "would be substantially injured by the establishment of the Rittenhouse dealership within 4.25 miles" and that this would have "a significant and adverse effect upon the stability of Monmouth." Accordingly, the protest was upheld under *N.J. S.A.* 56:10–23 on the ground that the franchise "will be injurious to existing franchisees and to the public interest. . . ." The ALJ's decision turns on his belief that Monmouth's gross sales of new cars will be severely curtailed by "competition of a destructive nature," and that as a result it will have to reduce customer services, to the detriment of the public interest.

We find that the ALJ's premises of destructive competition and severe financial constrictions for Monmouth are assumptions only, supported neither by his underlying findings of fact nor the evidence itself. Finding number 11 states only that a future reduction in sales would have an "adverse affect [sic]" upon Monmouth's financial condition. Finding number 15 is that the "establishment of Rittenhouse Chrysler-Plymouth would have some adverse affect [sic] on the business of Monmouth and would reduce its sales." But these propositions lie beyond challenge almost as a matter of definition. Naturally, a reduction in sales will have some adverse effect. And it may well be that the presence of a rival dealer, where previously there had been none, will reduce Monmouth's sales. But unless the loss is in some way quantified and juxtaposed with gross revenues it is impossible to determine whether and in what sense it will be injurious to the existing franchisee and the public interest. Without such proofs and findings thereon we

have no way of deciding whether the prospective loss will be minuscule or whether it will be significant under the statutory criterion. In our view, the Legislature did not intend that the statutory injury consist of nothing more than the placement of a competitor in the relevant market area. From the evidence and the ALJ's findings it clearly appears that the effects of the Rittenhouse franchise on Monmouth only reflect the operation of legitimate economic forces without offense to sound public policy and without any predatory infringement by Chrysler upon those business interests of Monmouth which are entitled to protection.

Monmouth's principal witness was Kenneth Dawson, its general manager. His testimony went little further than to suggest the adverse consequences of a substantial fall-off of Monmouth's gross sales, i.e., the loss of employees and the discontinuation of special services. He furnished no details concerning the loss of business nor did he offer proofs from which the anticipated reduction in sales could be measured. He summarized the full scope of Monmouth's anxiety by the following statement: "I am concerned about any dealer that's going in and going to be competitive with me. And myself not being able to have products to beat him." The latter sentence alludes to his complaint that Monmouth had been inadequately supplied with inventory from Chrysler and his concern that a new dealer in the area would cause further reductions of his supply. When asked on cross examination how concerned he would be if he could get sufficient products, his answer was "I don't know." The uncontradicted testimony given by Chrysler is that the establishment of a new dealership will have no effect on Monmouth's supply since the allocation for Rittenhouse would not be taken from the general allocation for Monmouth's zone.

The ALJ found that Monmouth "is in a healthy financial condition." Questioned whether Monmouth was competitive with all the surrounding dealers, Mr. Dawson replied "I beat them all as far as price. At least I try to." He also testified that given sufficient inventory he could increase his current

monthly sales of between 50–55 units to as many as 150, suggesting, in our minds, that the area could well support the presence of another Chrysler-Plymouth dealer. Moreover, the ALJ concluded that the establishment of the Rittenhouse dealership "would have no effect upon the 'stable, adequate and reliable sales and service' to purchasers of Chrysler Products [sic]." Thus, although Rittenhouse's presence may conceivably weaken Monmouth's financial viability, this alone cannot support a finding of "injury," in the statutory sense, to Monmouth and the public interest.

Dawson also testified to a substantial increase in trade since he took over as general manager around May 1981. This probably resulted, at least in part, from Monmouth's absorption of business that might otherwise have gone to the Belmar dealership which terminated in 1979. Therefore, at least part of whatever loss Monmouth experiences because of Rittenhouse's competition would simply reflect a reduction of gains made after it acquired a monopoly of Chrysler products in the area.

While we refrain from speculating as to the legislative concept of "injury" which may be applicable to all cases, for present purposes it is relevant to note the following sponsor's statement as to the purpose of the legislation:

> This bill is designed to add New Jersey to the 19 states which have enacted laws giving auto dealers a voice in the heretofore unilateral establishment or relocation of dealerships by manufacturers or distributors. These laws seek to safeguard the consumer by assuring that full service dealerships—those providing comprehensive service and parts supply facilities in addition to sales operations—are able to continue in business in the face of sales-oriented facilities that frequently are introduced into a market by manufacturers or distributors. Too often such "stimulator" operations only minimally provide service and a full inventory of parts, functions which are vital to car owners.

In determining whether the proposed dealership offended the foregoing policy behind the legislation the ALJ came to the following conclusion:

> Clearly, this is not the case. Rittenhouse has no intention of coming in as a "stimulator" operation. It is a long-established dealership spanning three generations and the testimony of Mr. Rittenhouse leaves no question but that it

is his intention to make a substantial investment and to offer service which, in his opinion, would be even better than that offered by Monmouth.

■ Both Monmouth and the ALJ give considerable emphasis to the existing arrangement between Chrysler and Monmouth for the use of Monmouth's real estate. After purchasing the property from Chrysler in 1972 for a fair market price of $553,000, Monmouth leased it to Chrysler for a term of 15 years together with 5 five year options to renew. The premises were then leased back to Monmouth for a term of 15 years with provision for termination if Monmouth ceased to exist as an authorized Chrysler dealer at that location. The ALJ explained his conclusion that this was "the type evil against which the statute was intended to act" in the following way:

> Chrysler has Monmouth totally and completely under its control. If it is allowed to set up competition of a destructive nature, it has no concern with the outcome. If Monmouth succeeds, it will have two viable dealerships; if Monmouth fails, it will have an empty location over which it has total and complete control. If both dealers fail, Chrysler has absolutely nothing to lose because it has an economically valuable piece of land, while Monmouth can only use it for the sale of Chrysler products. Chrysler can do whatever it wishes with the property.

We are not convinced by the foregoing reasoning. As we said earlier, the expectation that Rittenhouse's competition will be of a "destructive nature" is not supported by the evidence. Furthermore, whether Chrysler or Monmouth is more greatly favored by the arrangement, and which of the two entities will be more greatly benefitted years hence should the contemplated events come to pass, is entirely conjectural. That the property will continue to appreciate in value is by no means a certainty, and in any case Monmouth will remain as owner favored by a long term lease with a substantial lessee.

Moreover, and more to the point, the arrangement between Chrysler and Monmouth as to the real estate is irrelevant to whether the proposed new dealership will work an injury to Monmouth and the public interest. It has no place in the chain of facts between the creation of a new franchise and harm to Monmouth. Indeed, the very harm contemplated as flowing from the real estate arrangement is posited only as a conse-

quence of Monmouth being driven out of business by the Rittenhouse competition. But the probability of this occurring is neither demonstrated by the factual findings nor allowed by the evidence. See *Parkview Village Asso. v. Boro. of Collingswood,* 62 *N.J.* 21, 34 (1972); *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599 (1965); *Jones v. College of Med. & Dent. of N.J., Rutgers,* 155 *N.J.Super.* 232, 240 (App.Div.1977), certif. den. 77 *N.J.* 482 (1978).

Chrysler's other contention is that the legislation in question, which became effective October 27, 1982, is inapplicable herein for the reason that Chrysler had formed an intention to fill the vacated dealership prior to that date. We conclude that the provisions of the Act become operative at such time as a franchisor commits itself to enfranchise a dealership in the relevant market area, and the evidence leaves no doubt that this did not occur until at least June 1983.

Reversed.