MONMOUTH CHRYSLER–PLYMOUTH, INC., PETITIONER-APPELLANT, v. CHRYSLER CORPORATION, RESPONDENT-RESPONDENT, AND RITTENHOUSE LINCOLN MERCURY, INC., INTERVENOR-RESPONDENT.

Argued January 22, 1986—Decided May 20, 1986.

486

*Warren W. Wilentz* argued the cause for appellant (*Wilentz, Goldman & Spitzer,* attorneys; *Lillian Messina Nugent,* on the brief).

*Dennis R. LaFiura* argued the cause for respondent (*Pitney, Hardin, Kipp & Szuch,* attorneys; *Dennis R. LaFiura* and *Ernest J. Cicconi,* on the brief).

*Martin J. McGreevy* argued the cause for intervenor-respondent (*Carton, Nary, Witt & Arvanitis,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

In this case Chrysler Corporation (Chrysler) sought to establish a new dealership in Asbury Park for its Plymouth and Chrysler automobiles. Appellant Monmouth Chrysler-Plymouth, Inc. (Monmouth), an existing Chrysler dealer located in Eatontown approximately 4.25 miles from the proposed dealership, filed a protest with the Motor Vehicle Franchise Committee (Committee) pursuant to the New Jersey Motor Vehicle Franchise Act, *N.J.S.A.* 56:10–16 to –25 (Act). Monmouth con-

tended that the new dealership would be "injurious" to it and to the public interest. The Committee upheld the protest and enjoined the establishment of the new dealership.[1] The Appellate Division reversed, 203 *N.J.Super.* 281 (1985), holding that the evidence did not support the Committee's conclusion that the establishment of the new dealership would be injurious. We granted certification, 102 *N.J.* 336 (1985), to review the decision of the Appellate Division and to consider the standard to be applied in determining whether a new automobile dealership is "injurious to existing franchisees and to the public interest." *N.J.S.A.* 56:10-23.

## I

The Motor Vehicle Franchise Act parallels legislation adopted by a number of states[2] for the purpose of "giving auto dealers

---

[1] 4 *N.J.A.R.* 385 (Initial Decision), aff'd, 4 *N.J.A.R.* 385, 403 (Motor Vehicle Franchise Comm.1983).

[2] Other states vary in their approach to the problem of redressing the power imbalance that exists between automobile dealers and manufacturers. The majority of state laws focus on whether there is "good cause" either to permit or deny a new franchise. They provide various criteria for determining whether "good cause" exists. For example, North Carolina's statute requires consideration of the following:

1. The permanency of the investment of both the existing and proposed additional new motor vehicle dealers;

2. Growth or decline in population, density of population, and new car registrations in the relevant market area;

3. Effect on the consuming public in the relevant market area;

4. Whether it is injurious or beneficial to the public welfare for an additional new motor vehicle dealer to be established;

5. Whether the new motor vehicle dealers of the same line make in that relevant market area are providing adequate competition and convenient customer care * * *;

6. Whether the establishment of an additional new motor vehicle dealer or relocation of an existing new motor vehicle [sic] in the relevant market area would increase competition in a manner such as to be in the long-term public interest; and

7. The effect on the relocating dealer of a denial of its relocation into the relevant market area. [N.C.Gen.Stat. § 20-305(5)(b).]

a voice in the heretofore unilateral establishment or relocation of dealerships by manufacturers or distributors." Sponsor's Statement accompanying A.636. The Act requires a franchisor to give existing franchisees "in the same line make within the relevant market area 90 days' advance written notice of its

See also Ariz.Rev.Stat.Ann. § 28–1304.02(C) (Supp.1985); Cal.Veh.Code Ann. §§ 3062, 3063 (West Supp.1985); Ill.Rev.Stat. ch. 121½, § 752 (Supp.1985); Iowa Code § 322A.4 (1985); Neb.Rev.Stat. § 60–1422 (1974); Nev.Rev.Stat. § 482.36365 (1977); N.H.Rev.Stat.Ann. § 357–C:9 (1984); N.C.Gen.Stat. § 20–305(5) (1983); Ohio Rev.Code Ann. § 4517.50 (1982); Okla.Stat. tit. 47, § 578 (Supp.1984–1985); Pa.Stat.Ann. tit. 63, § 818.18 (Purdon Supp.1985); R.I. Gen.Laws § 31–5.1–4.2 (Supp.1985); S.D.Comp.Laws Ann. §§ 32–6A–3, –4 (1984); Tex.Rev.Civ.Stat.Ann. Art. 4413(36)(D) § 4.06(c) (Vernon 1976); Vt.Stat. Ann. tit. 9, § 4098 (1984); Wis.Stat.Ann. § 218.01(3)(f)(1) (Supp. 1985–1986). Other state laws ask whether creating a new franchise would be "inequitable" or "arbitrary." Colo.Rev.Stat. § 12–6–120 (1973); Mass.Gen. Laws Ann., ch. 93B, § 4(3)(1) (1984); N.M.Stat.Ann. § 57–16–5(P) (Supp. 1985). Two states focus on the adequacy of existing brand representation in conjunction with the propriety of allowing a new franchise, La.Rev.Stat.Ann. 32:1254(F), (G) (West Supp.1986); Tenn.Code Ann. § 55–17–114(c)(20) (Supp.1985); one allows a new franchise only if existing franchisees have either violated their franchise agreement or failed to adequately represent the manufacturer, Fla.Stat. § 320.642 (West Supp.1985) (repealed by Laws 1981, c. 81–318 effective October 1, 1988); and one focuses on whether the market will support both existing and proposed dealerships, Va.Code § 46.1–547(d) (Supp.1985).

The case law tracks the criteria set forth in the various state statutes. *See, e.g., Piano v. State*, 103 *Cal.App.*3d 412, 163 *Cal.Rptr.* 41 (Ct.App.1980) (good cause); *Dave Zinn Toyota, Inc. v. Department of Highway Safety*, 432 *So.*2d 1320 (Fla.App. 3d Dist.1983) (compliance with franchise agreement and adequacy of manufacturer representation); *Benson & Gold Chevrolet v. Louisiana Motor Vehicle Comm'n*, 403 *So.*2d 13 (La.1981) (adequacy of representation and public interest); *Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc.*, 14 *Mass.App.* 396, 440 *N.E.*2d 29 (App.Ct.1982) (arbitrariness); *Desert Chrysler-Plymouth v. Chrysler Corp.*, 95 *Nev.* 640, 600 *P.*2d 1189 (1979) (good cause), *cert.* denied, 445 *U.S.* 964, 100 *S.Ct.* 1652, 64 *L.Ed.*2d 239 (1980); *American Motors Sales Corp. v. Peters*, 311 *N.C.* 311, 317 *S.E.*2d 351 (1984) (good cause); *General Motors Corp. v. Capitol Chevrolet Co.*, 645 *S.W.*2d 230 (Tenn.1983) (adequacy of service and propriety of new franchise); *Continental Cars v. Texas Motor Vehicle Comm'n*, 697 *S.W.*2d 438 (Tex.App. 3d Dist.1985) (good cause); *American Motors Sales v. Division of Motor Vehicles*, 592 *F.*2d 219 (4th Cir.), *cert.* denied, 444 *U.S.* 836, 100 *S.Ct.* 71, 62 *L.Ed.*2d 47 (1979) (upholding "market will support" standard against. Commerce Clause challenge); *Forest Home Dodge v. Karns*, 29 *Wis.*2d 78, 138 *N.W.*2d 214 (1965) (good cause).

intention to grant, relocate, reopen or reactivate a franchise of the same line make * * *." *N.J.S.A.* 56:10–19. The "relevant market area" is the "geographic area 8 miles in radius from a proposed franchise * * *." *N.J.S.A.* 56:10–16(f). Within thirty days after either receipt of the notice or conclusion of the franchisor's internal appeal procedure, whichever is later, an aggrieved franchisee may file a protest with the Motor Vehicle Franchise Committee.[3] *N.J.S.A.* 56:10–19. After a hearing,[4] the Committee must determine whether the new distributorship will be "injurious" in accordance with the criteria set forth in section 8 of the Act:

> In determining whether the grant, relocation, reopening or reactivation of a franchise or establishment, relocation, reopening or reactivation of a business will be injurious to existing franchisees and to the public interest, the committee may consider, but shall not be limited to considering the following:
>
> a. The effect that the proposed franchise or business would have on the provision of stable, adequate and reliable sales and service to purchasers of vehicles in the same line make in the relevant market area;
>
> b. The effect that the proposed franchise or business would have on the stability of existing franchisees in the same line make in the relevant market area;
>
> c. Whether the existing franchisees in the same line make in the relevant market area are providing adequate and convenient consumer service for motor vehicles of the line make in the relevant market area, which shall include the adequacy of motor vehicle sales and service facilities, equipment, supply of motor vehicles parts and qualified service personnel;
>
> d. The effect on a relocating dealer of a denial of its relocation into the relevant market area. [*N.J.S.A.* 56:10–23.]

To discern the limits intended to be imposed by the broad statutory criteria for determining injury, we look first to the legislative history. The Sponsor's Statement noted that the Act was intended to redress the lack of a forum for an automobile dealer to protest against the arbitrary insertion of a new dealer

---

[3]*N.J.S.A.* 56:10–17 states that, "[t]he committee shall consist of the Director of the Division of Motor Vehicles, the Commissioner of the Department of Commerce and Economic Development and the Director of the Division of Consumer Affairs."

[4]The hearing may be conducted either by the Committee or by the Office of Administrative Law. *N.J.S.A.* 56:10–19.

into its market area. The sponsor cited with approval the Supreme Court's opinion in *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 *U.S.* 96, 99 *S.Ct.* 403, 58 *L.Ed.*2d 361 (1978), which upheld the validity of an analogous statute enacted in California. The Court in *Fox* relied on a 1956 Congressional Committee Report that found that:

> Dealers are with few exceptions completely dependent on the manufacturer for their supply of cars. When the dealer has invested to the extent required to secure a franchise, he becomes in a real sense the economic captive of his manufacturer. The substantial investment of his own personal funds by the dealer in the business, the inability to convert easily the facilities to other uses, the dependence upon a single manufacturer for supply of automobiles, and the difficulty of obtaining a franchise from another manufacturer all contribute toward making the dealer an easy prey for domination by the factory. On the other hand, from the standpoint of the automobile manufacturer, any single dealer is expendable. The faults of the factory-dealer system are directly attributable to the superior market position of the manufacturer. [439 *U.S.* at 100 n. 4, 99 *S.Ct.* at 407 n. 4, 58 *L.Ed.*2d at 370 n.4.]

■■ Both the Sponsor's Statement and the Governor's Conditional Veto Message observed that the Act complemented the objectives of New Jersey's Franchise Practices Act, *N.J.S.A.* 56:10–1 to –15. According to the Governor's Conditional Veto,

> our Franchise Practices Act is one of the fairest and most reasonable legislative reactions to the franchising boom. Nevertheless, it is clear to me that the protections afforded by that Act can be eroded if a motor vehicle franchisor unfairly attempts to insert a new dealership in close proximity to another dealership, thereby evading the reach of our Franchise Practices Act. [*N.J.S.A.* 56:10–16.]

The principal thrust of the Franchise Practices Act is to prohibit a franchisor from terminating or failing to renew a franchise without "good cause," which is defined as the failure by the franchisee to substantially comply with the requirements imposed upon it by the franchise agreement. *N.J.S.A.* 56:10–5; *see Shell Oil Co. v. Marinello*, 63 *N.J.* 402, 409 (1973), *cert.* denied, 415 *U.S.* 920, 94 *S.Ct.* 1421, 39 *L.Ed.*2d 475 (1974). Its protective provisions have been construed to prohibit wrongful terminations of franchises achieved either directly or indirectly. *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 502 *F.Supp.* 637, 653 (D.N.J.1980). Because of the intended correlation between the Franchise Practices Act and the Motor Vehicle

Franchise Act, the conclusion is inescapable that one standard for demonstrating "injury" under the latter Act is proof that the new distributorship would inflict such economic damage to an existing franchisee as to result in its eventual demise. *Cf. Benson & Gold Chevrolet v. Louisiana Motor Vehicle Comm'n*, 403 *So.*2d 13, 20 (La.1981) ("[T]he legislative concern was with the overloading of a market area when * * * the fresh competition might virtually destroy the older franchisee. In this manner, the manufacturer could accomplish by indirection that which the law directly prohibits: the unfair termination of a dealer's franchise.").

Proofs sufficient to meet a standard that equates "injury" with the complaining dealer's ultimate insolvency will obviously be difficult to adduce, particularly since protests asserted under the Act will invariably involve questions of prospective injury. Accordingly, the focus of our concern is whether a standard of franchisee injury that falls short of inevitable termination would be consistent with the legislative intent.

■ At the outset, it is relevant to acknowledge that to the extent the effect of the Act may be to limit the number of motor vehicle distributors in the state, the Act will tend to diminish intrabrand competition in the sale of automobiles. In *New Motor Vehicle Bd. v. Orrin W. Fox Co., supra,* the Supreme Court rejected the contention that a similar California statute violated the Sherman Act, 15 *U.S.C.* §§ 1–7, by restraining intrabrand competition, holding that the California regulation was "outside the reach of the antitrust laws" by virtue of the "state action" exemption. 439 *U.S.* at 109–12, 99 *S.Ct.* at 411–13, 58 *L.Ed.*2d at 375–77 (citing *Parker v. Brown,* 317 *U.S.* 341, 63 *S.Ct.* 307, 87 *L.Ed.* 315 (1943), and *Exxon Corp. v. Governor of Maryland,* 437 *U.S.* 117, 98 *S.Ct.* 2207, 57 *L.Ed.*2d 91 (1978)). That exemption immunizes competitive restraints from antitrust attack to the extent that such restraints constitute "state action or official action directed by a state." *Parker v. Brown, supra,* 317 *U.S.* at 351, 63 *S.Ct.* at 313, 87 *L.Ed.*

at 326; *see* ABA Antitrust Section, *Antitrust Law Developments* 606 (2d ed. 1984). Unquestionably, the state-action exemption would apply to the Motor Vehicle Franchise Act if its application unreasonably restrained intrabrand dealer competition in the sale of new automobiles.

■ Nevertheless, in construing the Act, we have a duty to attempt to harmonize its application, to the extent possible, with our own State antitrust law. *N.J.S.A.* 56:9–1 to –19. *See State v. Green,* 62 *N.J.* 547, 554–55 (1973). That effort necessarily implicates federal Sherman Act precedents since our State antitrust provisions are patterned after the Sherman Act, and we have previously acknowledged the significance of federal antitrust decisions in the interpretation of our State antitrust law, *Pomanowski v. Monmouth County Bd.,* 89 *N.J.* 306, 313 *cert.* denied, 459 *U.S.* 908, 103 *S.Ct.* 213, 74 *L.Ed.*2d 170 (1982); *State v. Lawn King, Inc.,* 84 *N.J.* 179, 192 (1980). Therefore, in assessing the extent to which the Motor Vehicle Franchise Act should protect existing dealers by restraining intrabrand competition in automobile sales, we are informed by the federal decisions that recognize the right of manufacturers to restrain intrabrand competition by imposing reasonable territorial restrictions on dealer locations.

The leading case concerning territorial restrictions by a manufacturer on the resale of its goods is *Continental T.V., Inc. v. G.T.E. Sylvania Inc.,* 433 *U.S.* 36, 97 *S.Ct.* 2549, 53 *L.Ed.*2d 568 (1977). In that case, a major franchisee of Sylvania television sets challenged the legality of a marketing system initiated by Sylvania to increase its share of the national market. Sylvania's marketing concept was to sell its product directly to a select group of aggressive franchised retailers. To encourage these retailers to promote the sale of Sylvania products, Sylvania restricted intrabrand [5] competition by requiring fran-

---

[5]The Court in *Sylvania* distinguised intrabrand from interbrand competition:

chisees to sell Sylvania products only from franchised locations. Continental was one of Sylvania's protected franchisees, but Sylvania decided to franchise another retailer in San Francisco a short distance from one of Continental's outlets. In response, Continental violated Sylvania's location restriction policy by attempting to sell Sylvania products from an unfranchised location in Sacramento. Relations between Sylvania and Continental rapidly deteriorated, causing Sylvania to terminate Continental's franchise. Litigation ensued in which Continental alleged that the location restrictions imposed by Sylvania on its franchisees violated the Sherman Act.

The District Court, relying on *United States v. Arnold Schwinn & Co.*, 388 *U.S.* 365, 87 *S.Ct.* 1856, 18 *L.Ed.*2d 1249 (1967), instructed the jury that any location restrictions were illegal *per se* if applied to goods purchased from Sylvania by Continental, and the jury accordingly returned a verdict in favor of Continental. The Court of Appeals for the Ninth Circuit, sitting *en banc*, reversed on the basis that *Schwinn* was distinguishable because of differences in the vertical restraints, their competitive impact, and the market shares of the respective franchisors. The Supreme Court affirmed. The Court found *Schwinn* indistinguishable, but overruled it in favor of a "rule of reason" approach to vertical restraints. Observing that vertical restraints "in varying forms, are widely used in our free market economy," 433 *U.S.* at 57, 97 *S.Ct.* at 2561, 53 *L.Ed.*2d at 585, the Court endorsed a rule of reason approach based on its conclusion that vertical restraints may promote valid and desirable marketing goals:

> Interbrand competition is the competition among the manufacturers of the same generic product—television sets in this case—and is the primary concern of antitrust law * * *. In contrast, intrabrand competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer. [*Continental T.V., Inc. v. G.T.E. Sylvania Inc.*, 433 *U.S.* 36, 51 n. 19, 97 *S.Ct.* 2549, 2558 n. 19, 53 *L.Ed.*2d 568, 581 n. 19 (1977).]

> Vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products. These "redeeming virtues" are implicit in every decision sustaining vertical restrictions under the rule of reason. Economists have identified a number of ways in which manufacturers can use such restrictions to compete more effectively against other manufacturers. * * * For example, new manufacturers and manufacturers entering new markets can use the restrictions in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer. Established manufacturers can use them to induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products. Service and repair are vital for many products, such as automobiles and major household appliances. The availability and quality of such services affect a manufacturer's goodwill and the competitiveness of his product. Because of market imperfections such as the so-called "free rider" effect, these services might not be provided by retailers in a purely competitive situation, despite the fact that each retailer's benefit would be greater if all provided the services than if none did.[6] [*Id.* 433 *U.S.* at 54–55, 97 *S.Ct.* at 2560, 53 *L.Ed.*2d at 583–84 (citations omitted).]

Antitrust commentators, both pre- and post-*Sylvania,* have generally endorsed the viewpoint expressed by the Court in *Sylvania* that vertical restraints can serve important marketing objectives and should be dealt with under the rule of reason. *See* Bork, "Vertical Restraints: Schwinn Overruled," 1977 *The Supreme Court Review* 171; Posner, "Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions," 75 *Colum.L.Rev.* 282 (1975); Robinson, "Recent Antitrust Developments—1979," 80 *Colum.L.Rev.* 1, 13–14 (1980); "The Supreme Court, 1976 Term," 91 *Harv.L.Rev.* 70, 231–41 (1977); Note, "Vertical Restraints—Legality of Non-Price Vertical Restraints Determined Under Rule of Reason," 9 *Seton Hall L.Rev.* 496 (1978); *cf.* Pitofsky, "The *Sylvania* Case: Antitrust Analysis of Non-Price Vertical Restrictions," 78 *Colum.L.Rev.* 1 (1978) (*per se* illegality is proper rule for certain categories of vertical restriction). *But cf.* Comanor, "Vertical Price-Fixing,

---

[6]The Court also noted that federal and state statutes regulating product safety and common-law products liability decisions encouraged a manufacturer "to exert control over the manner in which his products are sold and serviced." 433 *U.S.* at 55 n. 23, 97 *S.Ct.* at 2560 n. 23, 53 *L.Ed.*2d at 583 n. 23.

Vertical Market Restrictions, and the New Antitrust Policy," 98 *Harv.L.Rev.* 983 (1985) (many vertical restraints may actually harm consumers). Most of the post-*Sylvania* decisions have upheld manufacturer's territorial and customer restrictions under the rule of reason. *Antitrust Law Developments, supra,* at 70–72 (cases collected at n. 484).

As noted, we seek to harmonize the Motor Vehicle Franchise Act with the principles and purposes of the antitrust law. The central focus of modern antitrust analysis is the recognition that business efficiency and interbrand competition enhance consumer welfare. *See* Bork, "The Rule of Reason and the *Per Se* Concept: Price Fixing and Market Division I," 74 *Yale L.J.* 775, 829–32 (1965). Decisions that uphold vertical restraints, such as location or territorial restrictions, are generally based on a recognition that reasonable vertical restraints enhance interbrand competition and thus benefit the consuming public. It has been noted that "[j]udicial deference to the manufacturer's business judgment is grounded in large part on the assumption that the manufacturer's interest in minimum distribution costs will benefit the consumer." *A.H. Cox & Co. v. Star Mach. Co.,* 653 *F.*2d 1302, 1306 (9th Cir.1981) (citing *Continental T.V., Inc. v. G.T.E. Sylvania, Inc., supra,* 433 *U.S.* at 54–56, 97 *S.Ct.* at 2559–2561, 53 *L.Ed.*2d at 582–84).

A manufacturer's effort to enhance sales and profits through location restrictions that encourage better dealer services affords obvious benefits to the consumer. Unchecked intrabrand competition may discourage dealers from providing adequate customer services. Because a "free rider" can usurp the benefits of the advertising and sales efforts of a competing dealer, that dealer may be unwilling to provide such services.[7] Fur-

---

[7]One commentator has offered a relevant illustration of the "free rider" problem:

> Let automobile dealer A provide the elaborate showroom and other services that consumers demand and raise his price to cover the costs of the services. Dealer B, rather than provide any services, can suggest to his

ther, as Judge Bork suggests, in some situations "local sales efforts [could] fall below optimal proportions because particular markets were too small to repay the efforts of two sellers of a single brand." "The Rule of Reason and the *Per Se* Concept: Price Fixing and Market Division II," 75 *Yale L.J.* 373, 438 (1966). Both courts and commentators have recognized the validity of territorial or location restrictions aimed at improving the quality of services dealers provide. *See, e.g., Continental T.V. v. G.T.E. Sylvania, Inc., supra,* 433 *U.S.* at 55, 97 *S.Ct.* at 2560, 53 *L.Ed.*2d at 583–84; *Sandura Company v. FTC,* 339 *F.* 2d 847, 856–57 (6th Cir.1964); *Donald B. Rice v. Michelin Tire Corp.,* 483 *F.Supp.* 750, 757–59 (D.Md.1980), aff'd, 638 *F.*2d 15 (4th Cir.), *cert.* denied, 454 *U.S.* 864, 102 *S.Ct.* 324, 70 *L.Ed.*2d 164 (1981); Bork, "The Rule of Reason and the *Per Se* Concept: Price Fixing and Market Division II," 75 *Yale L.J.* 373, 435–36 (1966); Posner, *supra,* at 283–85.

■ The primary purpose of the restrictions on dealer competition countenanced by our Motor Vehicle Franchise Act is to protect existing dealerships from sustaining injury when a new dealer is inserted into its market area. Nevertheless, in setting forth standards for determining injury, the Act emphasizes the provision of "stable, adequate and reliable sales and service to purchasers," *N.J.S.A.* 56:10–23(a), a goal also recognized by the Court in *Sylvania* and the authorities cited above as an appropriate objective of manufacturers in imposing vertical restraints on distributors. Further, the avowed purpose of the Act was

---

customers that they first utilize A's services to pick the car model they want and then return to B for the purchase. B can offer a lower price than A since B does not incur the expenses that A incurs in providing services. Faced with B's lower-priced competition, A will eventually stop providing services (or provide fewer of them) and the automobile manufacturer's desire for point-of-sale services will be frustrated. [Posner, "Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions, 75 *Colum.L.Rev.* 282, 285 (1975).]

to safeguard the consumer by assuring that full service dealerships—those providing comprehensive service and parts supply facilities in addition to sales operations—are able to continue in business in the face of sales-oriented facilities that frequently are introduced into a market by manufacturers or distributors. Too often such "stimulator" operations only minimally provide service and a full inventory of parts, functions which are vital to car owners. [Sponsor's Statement Accompanying A.636.]

■ To this extent, then, the antitrust law and our Motor Vehicle Franchise Act recognize the common goal of protecting dealer services through restrictions on intrabrand competition. Accordingly, an appropriate standard for measuring injury under the Act, both to a franchisee and to the public interest, is proof that the effect of a new dealership would be to reduce the profitability of the protesting dealer to an extent sufficient to cause a substantial deterioration of that dealer's ability to provide adequate customer services. That standard of injury strikes a balance between evidence of inevitable termination due to business failure, a standard we find relevant but difficult to prove, and evidence merely of reduced profits.

■ In virtually every case in which a new dealer is introduced into part of an existing dealer's market area, the existing dealer will be able to offer evidence that sales and profits will be adversely affected. *See, e.g., Ricky Smith Pontiac v. Subaru of New England, Inc.,* 14 *Mass.App.* 396, 423, 440 *N.E.* 2d 29, 47 (App.Ct.1982). Unless the protesting dealer can demonstrate by a preponderance of the evidence that the anticipated loss of business will cause a substantial deterioration of its ability to provide customer services, loss of profits alone will not be sufficient to sustain a claim of injury to a franchisee under the Act. *Cf. Benson and Gold Chevrolet v. Louisiana Motor Vehicle Comm'n, supra,* 403 *So.*2d at 21–22 (not the purpose of Louisiana Act to keep every auto dealer safe from financial loss); *McLaughlin Ford v. Ford Motor Co.,* 192 *Conn.* 558, 569, 473 *A.*2d 1185, 1192 (1984) (proof of some loss of sales due to increased intrabrand competition insufficient to ground action under Connecticut Unfair Trade Practices Act). An interpretation of the Act that equated lost profits alone with

injury to the franchisee would have the practical effect of prohibiting the franchising of any new automobile dealers within eight miles of an existing franchisee, a result that could not reasonably have been intended by the Legislature in adopting the Act.

■ The legislative history of the Act suggests that an additional factor to consider in determining if injury has been proved is the franchisor's motivation in attempting to establish a new dealership. The Sponsor's Statement emphasizes that prior to the Act a dealer had no forum to object when a manufacturer *"arbitrarily* inserted another dealership into his market area." Sponsor's Statement accompanying A.636 (emphasis added). Similarly, the Governor's conditional veto message recognized that the protections afforded by the Franchise Practices Act could be avoided "if a * * * franchisor *unfairly* attempts to insert a new dealership in close proximity to another dealership." *N.J.S.A.* 56:10–16 (emphasis added). This focus on preventing arbitrary or unfair conduct is consistent with the Sponsor's description of the dealer as "in a real sense the economic captive of his manufacturer." *New Motor Vehicle Bd., supra,* 439 *U.S.* at 100 n. 4, 99 *S.Ct.* at 407 n. 4, 58 *L.Ed.*2d at 370 n. 4.

It is a pragmatic concession to the automobile manufacturer's economic leverage to acknowledge that a decision to franchise a new dealer could be prompted in part by non-economic considerations. Congress recognized that new dealer franchising decisions may be prompted by improper motivations when it enacted the Automobile Dealers' Day in Court Act, 15 *U.S.C.A.* §§ 1221–25 (West 1982). That statute affords a federal cause of action to an automobile dealer who sustains injury as a result of a manufacturer's failure "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, cancelling, or not renewing the franchise * * *." 15 *U.S.C.A.* § 1222. The legislative history

points out that the appointment of a new dealer does not violate the statute in the absence of improper motives:

> The bill does not freeze present channels or methods of automobile distribution and would not prohibit a manufacturer from appointing an additional dealer in a community *provided that the establishment of the new dealer is not a device by the manufacturer to coerce or intimidate an existing dealer.* [H.R.Rep. No. 2850, 84th Cong. 2d Sess. (1956) (emphasis added).]

A general purpose of the federal enactment, paralleling a primary objective of New Jersey's Motor Vehicle Franchise Act, is to alter the balance of power between automobile manufacturer and dealer. *See Randy's Studebaker Sales, Inc. v. Nissan Motor Corp. in U.S.A.*, 533 *F*.2d 510 (10th Cir.1976); *Hanley v. Chrysler Motors Corp.*, 433 *F*.2d 708, 710 (10th Cir.1970); *Woodard v. General Motors Corp.*, 298 *F*.2d 121, 127 (5th Cir.) *cert.* denied, 369 *U.S.* 887, 82 *S.Ct.* 1161, 8 *L.Ed.* 2d 288 (1962); *Blenke Bros. Co. v. Ford Motor Co.*, 203 *F.Supp.* 670, 671 (N.D.Ind.1962). In construing the Motor Vehicle Franchise Act, it is entirely appropriate that we consider the purpose and application of a federal statute intended to achieve similar objectives. *See State v. Lawn King, Inc., supra*, 84 *N.J.* at 192. Accordingly, we conclude that an additional criterion to be considered in determining injury under the Motor Vehicle Franchise Act is the motivation of the franchisor in designating the new dealer. If the protesting dealer is able to prove that the manufacturer's decision to franchise a new dealer in the relevant market area was not made in good faith, but to coerce, intimidate, or retaliate against an existing dealer, then that proof, combined with some evidence of economic injury, would satisfy the statutory test of injury to the franchisee.

To summarize, we hold that the criteria in *N.J.S.A.* 56:10–23 for determining whether a new dealership will be injurious to existing franchisees and to the public interest are to be applied with due regard for the purpose and scope of analogous federal legislation and the Act's legislative history. In that context, we

hold that the statutory standard of "injury" is met by proof by a preponderance of the evidence that the proposed dealership (1) would result in the inevitable termination of the existing dealer; (2) would cause a substantial deterioration in the protesting dealer's ability to provide adequate customer services; or (3) is motivated primarily by non-economic considerations such as the manufacturer's desire to coerce, intimidate or retaliate against an existing dealer, and that the new dealership will cause some economic injury to the existing dealer. These examples of proofs that would satisfy the statutory criteria for "injury" are not necessarily exhaustive.[8]

## II

■ We agree with the Appellate Division's conclusion that there is insufficient evidence in this record to support the administrative law judge's conclusion that Monmouth "would be substantially injured by the establishment of the Rittenhouse dealership within 4.25 miles" and that this would have "a significant and adverse effect upon the stability of Monmouth." At most, the evidence offered by Monmouth suggested that a new dealership would have an adverse effect on its business. However, virtually no proof was offered that tended to quantify the anticipated adverse effect on Monmouth. As Judge Antell appropriately observed:

> [U]nless the loss is in some way quantified and juxtaposed with gross revenues it is impossible to determine whether and in what sense it will be injurious to the existing franchisee and the public interest. Without such proofs and findings thereon we have no way of deciding whether the prospective loss will be minuscule or whether it will be significant under the statutory criterion. In our view, the Legislature did not intend that the statutory injury consist of nothing more than the placement of a competitor in the relevant market area. [203 *N.J.Super.* at 285–86.]

---

[8]We have not dealt in this opinion with the fourth statutory criterion, the effect on a relocating dealer of a denial of its relocation, *N.J.S.A.* 56:10–23(d), since this factor is not implicated by the record.

As to the impact on Monmouth's ability to provide customer services, a Chrysler witness conceded that a loss of sales volume could have an impact on Monmouth's service and parts departments, but the absence of any proof as to the extent of the projected sales losses precluded any findings, based on evidence in the record, that there would be a substantial deterioration in Monmouth's ability to provide adequate customer services.

It is not our intention to require threatened franchisees to prove with exactness the future consequences of a manufacturer's actions. Nevertheless, some degree of objectivity—whether by expert testimony or economic analysis—is necessary. Monmouth's proofs in this case were insufficient to entitle it to relief under the Act.

We also agree with the Appellate Division's conclusion that although Chrysler, because of its leasehold interest, would control Monmouth's property if Monmouth's dealership were terminated, such arrangements as to the real estate are "irrelevant to whether the proposed new dealership will work an injury to Monmouth and the public interest." *Id.* at 288. Absent a claim of bad faith emanating from Chrysler's desire to regain control of the real estate, of which there was no proof in the record, the existence of the leasehold arrangement "has no place in the chain of facts between the creation of a new franchise and harm to Monmouth." *Id.*

As modified, we affirm the judgment of the Appellate Division.

*For modification and affirmance*— Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN— 6.

*Opposed*— None.