**T.I.W., INC., d/b/a Richfield–Bloomington Honda, Plaintiff,**

v.

**AMERICAN HONDA MOTOR COMPANY, INC., Defendant.**

**Civ. No. 4–90–321.**

United States District Court, D. Minnesota, Fourth Division.

April 22, 1992.

William L. Killion, and Gregory Merz, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, MN, for plaintiff.

J. Donald McCarthy, and Robert W. Dickerson, Lyon & Lyon, Los Angeles, CA, for defendant.

DIANA E. MURPHY, Chief Judge.

This case was well-tried before the court for four and one-half days. Following trial the parties submitted written arguments and proposed findings of fact and conclusions of law. The court now submits in memorandum form its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a), based on its observation of the witnesses and their credibility, and upon review of the exhibits and deposition testimony.

Plaintiff T.I.W., Inc., d/b/a Richfield–Bloomington Honda (T.I.W.), is a Minnesota corporation operating a Honda automobile dealership located at 400 West 78th Street, Richfield, Minnesota.[1] T.I.W. sells new Honda automobiles, used automobiles, and automobile parts, as well as provides automobile service to its customers.

---

1. This paragraph and the subsequent five paragraphs are drawn from the parties stipulation of undisputed facts.

T.I.W. operates under a franchise agreement with American Honda Motor Company (American Honda).

Defendant American Honda is a California corporation with its principal place of business in California. American Honda is engaged in selling and distributing new Honda automobiles.

On or about March 27, 1990, T.I.W. received a letter dated March 23, 1990, addressed to T.I.W.'s president, Thomas Wood, from Frank J. O'Neill, Zone Sales Manager for American Honda, notifying T.I.W. of American Honda's intention to add a new Honda automobile dealership in Burnsville, Minnesota. That letter further indicated that the new dealership would be located in an area bounded by County Road 42 on the north, county Road 5 on the west, 150th Street on the south, and U.S. Highway 35E/35W on the east.

The proposed location for the proposed dealership is slightly less than 8.5 miles from T.I.W. This location is within T.I.W.'s relevant market area (RMA), which is defined by Minn.Stat. § 80E.14 as a radius of ten miles around an existing dealer.

On April 6, 1990, T.I.W. commenced suit against American Honda in Minnesota state district court, Hennepin County, pursuant to Minn.Stat. § 80E.14, challenging the establishment of a new Honda automobile dealership in Burnsville.

American Honda subsequently removed the action to this court, based on diversity of citizenship.

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, based on diversity of citizenship of the parties. T.I.W. is a new motor vehicle dealership within the meaning of Minn.Stat. § 80E.03, subd. 3. American Honda is a manufacturer within the meaning of Minn.Stat. § 80E.03, subd. 4. American Honda provided notice of its intent to establish the Burnsville dealership and T.I.W. commenced this action within the time periods specified and the procedures provided by Minn.Stat. § 80E.14.

The issue at trial was whether American Honda has good cause within the meaning of Minn.Stat. § 80E.14 to open the new Burnsville dealership. This statute provides that a manufacturer shall not establish a proposed new dealership within the protesting dealership's RMA unless there is "good cause" for permitting its establishment. In determining whether good cause has been established, the court "shall take into consideration the existing circumstances, including, but not limited to" nine factors which are described in the statute. These are:

(a) The extent, nature, and permanency of the investment of the proposed new dealership and the existing motor vehicle dealer in the relevant market area;

(b) The effect on the retail new motor vehicle business and the consuming public in the relevant market area;

(c) Whether it is injurious to existing new motor vehicle dealers in the relevant market area and the public welfare for an additional new motor dealership to be established;

(d) Whether the new motor vehicle dealers of the same line make in that relevant market area are providing adequate competition and convenient consumer care for the motor vehicles of the line make in the market area including the adequacy of motor vehicle sales and service facilities, equipment, supply of motor vehicle parts, and qualified service personnel;

(e) Whether the new motor vehicle dealers of the same line make in the relevant market area are providing adequate market penetration and representation; provided, that good cause shall not be shown solely by a desire for further market penetration;

(f) Whether the establishment of an additional new motor vehicle dealership would increase competition, and therefore be in the public interest;

(g) The growth or decline in population and new car registrations in the relevant market area;

(h) The effect the proposed new dealership would have on the provision of

stable, adequate, and reliable sales and service to purchasers of the same line make in the relevant market area; and

(i) The effect the proposed new dealership would have on the stability of existing franchises of the same line make in the relevant market area.

Minn.Stat. § 80E.14, subd. 2.

It is necessary to read the language of these statutory factors carefully. Some factors are restricted to the RMA, others do not specify a geographical restriction. The nine factors focus on the interests of three separate groups or entities: (1) the consuming public; (2) the protesting dealer; and (3) all new car dealers within the protestant's RMA.

Five of the nine factors involve consideration of the public welfare. These are factors: (b) the effect of the new dealer on the consuming public in the RMA; (c) whether it would be injurious to the public welfare to have the new dealer; (d) whether current Honda dealers in the RMA are providing convenient consumer care; (f) whether a new dealer would be in the public interest by increasing competition; and (h) the effect of the new dealer on the provision of stable, adequate, and reliable sales and service to Honda purchasers in the RMA. Of these five, two factors, (c) and (f), consider the public welfare generally, without being limited to the public within the RMA or to Honda consumers. The other three factors, (b), (d), and (h), are restricted to the public interest within the RMA, with (d) and (h) further limited to Honda consumers in the RMA.

Four of the nine factors focus on the protesting dealer. These are factors: (a) the extent, nature, and permanency of its investment; (d) whether it provides adequate competition and convenient consumer care in the RMA; (e) whether it provides adequate market penetration and representation (note this factor is not geographically restricted); and (i) the effect of the new dealer on the stability of the protesting dealer.

Two of the factors focus on all new car dealers within the protestant's RMA. These are factors: (b) the effect on the retail new car business in the RMA; and (c) whether it would be injurious to existing new car dealers in the RMA. These two factors appear to be very similar, with factor (c) being a more narrowly focused approach to the same issues relevant to factor (b).[2]

Certain factors also call for a balancing of the interests of different entities. Factor (a) calls for a balancing of the investment of the protesting dealer and the new dealer. The effect on all new car dealers in the RMA is conjoined with the effect on the consuming public in the RMA in factor (b), and with the public welfare generally in factor (c). Furthermore, by setting out a list of nine non-exclusive factors to guide consideration of "existing circumstances" in determining "good cause," the overall framework of the statute requires a general balancing of all the various conflicting interests. Thus no one factor should be determinative. For example, factor (c) asks whether establishing the new dealership would be injurious to existing dealers in the RMA; of course every new source of competition is to some extent injurious to existing businesses, at least by potentially siphoning off customers who choose the new business over the old. On the other hand, factor (f) asks whether the new dealership would increase competition ("and therefore be in the public interest"); of course every new business to some extent increases competition, at least potentially. Thus factors (c) and (f) potentially conflict; how much injury is likely under factor (c) must be compared to how much increase in competition is likely under factor (f).

In the present case, two circumstances stand out. The first is that T.I.W. is a strong, stable, and profitable dealership. It is one of seventeen dealerships owned by Tom Wood in three states. Its financial records show consistent profitability, including the line item for gross profits plus the owner's bonus separately recorded. In

---

**2.** A difference between factors (b) and (c) is that (b) looks to the consuming public within the RMA, while (c) looks to the public welfare generally, without geographic limits.

addition, Wood owns the land where T.I.W. is located and collects rent, and he receives both a salary and a management fee from T.I.W. He has already recovered his investment in the corporate assets of the dealership since its purchase in 1986. T.I.W. has also invested in improvements to its facilities, particularly to expand its service department, and it plans further investment. The record shows that T.I.W. has been profitable in all four of its departments: new car sales, used car sales, parts, and service. T.I.W. meets or exceeds American Honda's minimum requirements for capitalization and facilities.

Of the four Honda dealers in the Minneapolis/St. Paul metropolitan region (MSP), T.I.W. has been at or above average in terms of profits, new car sales, and service quality indices. There is a high level of cross-sell in MSP, meaning that each of the four dealers sells extensively into the others' primary market areas. From 1986–90, over two-thirds of T.I.W.'s new Honda sales were made within its RMA, but this represented only 21% of all new Honda sales registered within the RMA. Of the other new Honda sales, about 40% were made by the other three MSP Honda dealers, and about 40% by "pump-in" dealers outside MSP. This pump-in rate is typical for MSP, although it is higher than the rate in any other large metropolitan area in the nation. As to service quality, T.I.W. has consistently implemented suggestions from American Honda for improving customer services, and has recently extended its service hours and begun mailing a customer newsletter. Follow-up contacts with service customers indicate general satisfaction with T.I.W. Customer convenience is another matter, to be discussed below.

The picture of T.I.W. which emerges is of a stable and strong Honda dealer. There is no indication of financial troubles at T.I.W. It is owned by an experienced dealer with extensive resources. Within its RMA, T.I.W. generally provides stable, adequate, and reliable sales and service to Honda purchasers as compared with MSP averages.

A second circumstance which stands out in this case is the demographic trends relevant to T.I.W.'s location and that of the proposed new dealership. T.I.W. is located along Interstate 494, a major south suburban east-west highway, near the intersections of Interstate 35W and Cedar Avenue with I–494. This location is part of an extensive auto row, where many automobile dealers of different line makes are clustered together. There are approximately 60 new car dealers within T.I.W.'s RMA.

The northern part of T.I.W.'s RMA is more densely populated than the southern part. In 1990, there were about 273,400 households in the north and about 90,700 in the south. Since the proposed new dealership would be near the southern edge of the RMA, it would compete more directly with T.I.W. for the smaller southern pool of potential customers. T.I.W. acknowledges that it would maintain its geographic advantage with regard to the northern part of its RMA, although it points out that it competes to the northwest with Hopkins Honda, which is located seven miles away and within T.I.W.'s RMA. The northern section is growing at a slower rate than the southern section. The number of households in the north increased from 1980 to 1990 by 6%, or 14,700 households. This number is projected to grow another 3.5%, or 9,500 households, by 1995. The number of households in the south increased from 1980 to 1990 by 58%, or 33,200 households, and is projected to grow another 24%, or 21,900 households, by 1995. While the number of households in the southern half is growing at a faster rate (percentagewise) than the northern half, it is projected that in 1995 the northern half will still have twice as many households as the southern half.

Middle and upper income households are prime customers for Honda cars. A telling statistic for marketing is the number of households with an annual effective buying income in the range of $25,000 to $75,000. As of 1990, in the northern half of T.I.W.'s RMA 48.8% of the households, or 133,400, had incomes in this range, compared to 63.6% of the households, or 57,600, in the

southern half. While a higher percentage of the southern half is more affluent, the northern half has more than twice the actual number of households in the target income range. Thus the north has more than twice as many potential Honda customers as the south.

The Minnesota River runs from the southwest to the northeast about two miles south of T.I.W. The river is the boundary between Hennepin County to the north and Dakota County to the south. The river runs through a broad, marshy valley which forms a geographic barrier between the counties. There are major bridges nearby, including those along I–35W and Cedar Avenue, but during rush hour it can take as long as 45 minutes to an hour to make the transit from one side to the other. Reflecting the growth in Dakota County, an auto area has recently been developing along I–35W in Burnsville, near the Burnsville Center regional shopping mall. It includes a Toyota dealership and a Nissan dealership, two of Honda's chief competitors. This is the proposed site of the new Honda dealership, a location decision made by American Honda after careful demographic and marketing analysis.

The gulf between Hennepin and Dakota Counties is relevant to the convenience of consumer care for Honda automobiles. Three facts in this regard stood out at trial. First, Steve Wolf, service manager at T.I.W., testified that T.I.W. provides service customers with rides to their work or home after they have dropped off their automobile, but only to locations within 3 to 5 miles of T.I.W. If the customer is travelling further, T.I.W. will take them to a bus stop or rental car agency. Wolf stated that his runners are limited to 3 to 5 miles because otherwise it would be too far and too long to travel, keeping his runners tied up, particularly during rush hour when there are the most customer dropoffs and also the worst traffic. This means that his runners rarely travel south of the Minnesota River. The second fact standing out is that Wolf expects that he might lose some current service employees to the new Burnsville dealership because they live south of the Minnesota River and have to fight traffic to come to work at T.I.W., traffic which turns a 15 minute commute into a 45 minute drive. Third, Rolf Engbretson, T.I.W.'s parts manager, testified that he thought the new Burnsville dealership might cut into his parts business; he stated that this was a "convenience thing, they would be closer to the customers." He also testified that even with the new dealership, he expected T.I.W.'s parts department to remain profitable.

These difficulties at T.I.W. illustrate the problems which T.I.W.'s customers and potential customers face who live in Dakota County south of the river. The density of the traffic and continued household growth in Dakota County show that many people are braving this obstacle; but the development of an auto area in Burnsville and the steadily increasing retail sales in Dakota County show that businesses are responding by locating closer and more conveniently to these people. These location decisions are, as Engbretson acknowledged, a "convenience thing."

These two existing circumstances—the strength and stability of T.I.W. and the demographic trends in its RMA—weigh strongly toward permitting American Honda to establish the new dealership. The other factors also support this result, as described below, but the crux of the matter is that American Honda has shown good cause for establishing the new dealership because it would be in the public interest, as shown by the demographic trends, and because T.I.W. is strong enough to withstand whatever possible losses in business it might face without becoming unstable, inadequate, or unreliable in sales or service.

With this in mind, the statutory factors may be addressed in order:

(a): T.I.W.'s owner has invested about $5.7 million in the current Richfield/Bloomington Honda facilities. This is an extensive and permanent investment. The proposed owner and operator of the new Burnsville dealership is DCH Burnsville, Inc. (DCH), which is owned by DCH USA, Inc. The parent company owns and oper-

ates about 20 other new automobile dealerships, including Honda, Toyota, Acura, Nissan, Mazda, and Saturn. DCH has already invested about $725,000 for real estate, real estate options, and consulting and architects fees for the new dealership. DCH anticipates investing an additional $800,000 for real estate, $1.3–1.5 million for facilities construction, $0.75–1.0 million each for new and used car inventory, plus more for furniture, equipment, and working capital, making a total investment of about $5.0 million. The extent, nature, and permanency of investment made to date favors T.I.W., but DCH has already made significant investments and has the financial capability to complete its anticipated investments. The court finds that the total investment of the two dealers is about the same.

*(b) & (c):* The addition of one new dealership to the 60 already located within T.I.W.'s RMA would have a minimal effect on the total retail new motor vehicle business. There is no evidence that the additional dealership would be injurious to the retail new motor vehicle business as a whole. On the other hand, Dr. Norman Simler, an economist, testified that the new dealership would increase the level of competition in the market, both among Honda dealers and among dealers of other line makes. Given the price elasticity of new motor vehicles, this could improve the public welfare by lowering new car prices. It could also give consumers more choices for new car purchase, as well as giving them a greater choice in obtaining Honda parts and service.

Dr. Gerald Ford, a professor of marketing, testified that the market is large enough to support a new dealership in Burnsville. He stated that the market is sufficient so that the new dealership would not be injurious to existing dealers, and that the demographics show that public convenience and welfare would be served by adding the new dealership to such a growing area. Dr. Ford noted that there have been only four American Honda dealerships in MSP since 1977, despite tremendous growth in the number of households and population dispersion. Under these circumstances, he would expect that Honda would experience a declining market penetration rate for Honda over time, which has in fact occurred over the last few years, especially in relation to Toyota. He testified that while it is possible to have only one dealership for a line make in MSP, which could be reached (at whatever inconvenience) by every potential customer who wants to purchase a new car of that line make, it makes economic and marketing sense to establish multiple dealerships closer to where people live. Honda has a reputation for not "over-dealering" a region, but after 15 years of stasis it would serve the public welfare to establish a new Honda dealership in MSP generally, and in the Burnsville auto area of Dakota County in particular.

T.I.W.'s expert witnesses, Dr. George Schink, an economist, and Arthur Cobb, an accountant, agreed that there is a geographic advantage to having dealerships located close to potential customers. Dr. Schink testified that customers generally buy within 10 miles of where they live, so that a customer would be more likely to buy a competing line make located within 10 miles when a Honda dealer is not within 10 miles. He noted that Toyota has had a dealership in Burnsville since 1988 and Toyota's sales in that area have risen from 314 in 1986 to 849 in 1990; Honda's sales in the same area have fallen from 690 to 636 during the same time period. He pointed to factors other than the additional dealership in Burnsville which accounted for at least part of these sales statistics, but he acknowledged that Toyota's new dealerships (including two others farther east in Dakota County as well as in Burnsville) did lead to increased Toyota sales. Mr. Cobb also testified that a dealer close to potential customers has an advantage in making sales, so that properly dispersed line make dealers within a region would help that line make's sales in competition with other brands.

There was conflicting testimony concerning the extent of injury which T.I.W. might suffer should the new dealership be established. While statutory factors (b) & (c) do

not focus on the injurious effect on the protesting dealer in particular, the factors cover all retail new motor vehicle dealers in the RMA which includes T.I.W.

Dr. Schink estimated that the new dealership would lead to a 20% reduction in T.I.W.'s new car sales. This assumed that the new dealer would charge about the same prices as T.I.W. and the other MSP Honda dealers, and that sales by the new dealer would not be taken away from the pump-in dealers. Mr. Cobb reached the same estimate in lost sales, and further calculated that T.I.W.'s profits would decline about 20% as a result. Cobb and Schink both testified that this loss of revenues at T.I.W. could trigger a spiral of decline, leading T.I.W. over time to retrench, downscale, cut back on costs and eventually cut back on service in order to retain profits. Cobb estimated that T.I.W. would actually show a loss based on reduced sales and service due to the new dealership, but his calculations covered only the bottom line net profits at T.I.W. and excluded the owner's bonus, management fees and salary which, once factored in, would result in positive profits after the new dealership was established.

Dr. Ford testified in rebuttal that there were errors in the assumptions underlying the analysis of injury to T.I.W. by Schink and Cobb. He noted that the rate of pump-in sales in the Burnsville area of T.I.W.'s RMA is higher than the RMA as a whole, which shows that there are sales opportunities for the new Burnsville dealer which would not be taken away from T.I.W. He noted that Schink's figures are based on 1990 sales, which was a recession year with lower sales and which was a year when Toyota had taken market share from Honda. Based on 1986–90 averages, there was greater sales opportunity in the RMA than Schink calculated. Using reasonable historical market penetration rates and rates of household growth, Ford expressed his opinion that there was an adequate number of potential customers for T.I.W. and the new dealership.

Dr. Ford noted that the number of sales by pump-in dealers increased from 1986–90, showing that the market is not being adequately served by the four present MSP dealers. He testified that the MSP pump-in rate is far beyond the rate he has seen anywhere else. He denied that this rate could be accounted for simply by the lower overhead costs for the pump-in dealers, since this would be true in other metro areas as well, but other areas showed only one-quarter to one-half the rate of pump-ins as MSP. In his opinion, the pump-in rate here is the result of complex market behavior showing the inability of the four current Honda dealers to serve this market and their lack of aggressiveness in marketing.

The court finds that the establishment of the new dealership would have only minor effects on the existing new motor vehicle business in the RMA while it would be beneficial to the consuming public in the RMA and to the public welfare generally. T.I.W. might lose some sales, but given the sales potential in the RMA for T.I.W., including continued household growth in the north and the south, and the unusually high pump-in sales rates, these losses would not be extensive. The evidence does not support a finding that T.I.W. would become unprofitable. In addition, with the extensive financial resources available to T.I.W. and its history of profitability in all departments, there does not appear to be a significant risk that the new dealership would cause any diminution in T.I.W.'s capability to provide adequate customer services. On the other hand, the public would benefit from a new, conveniently located dealer.

*(d):* T.I.W. is a generally healthy dealership providing reasonable competition and service for Hondas considering its location. The trends show, however, that growth south of the Minnesota River is eroding Honda's market penetration there and causing problems for consumer convenience in reaching T.I.W. These circumstances have already been discussed. The court finds that this factor supports establishing a new dealership. This is not an indictment of the efforts at T.I.W., but a recognition of the demographic and geographic realities in Dakota County.

*(e):* Honda has led all line makes in sales in MSP over the last ten years. This dominance has eroded since 1986, however, as Toyota has risen to compete for the top position. This rise has been due to several factors: Toyota targeted MSP for aggressive sales campaigns and increased new car allocations, offered customer rebates on popular models, and opened new or relocated dealerships at three Dakota County sites. During the same time period, sales by the four existing Honda dealerships have declined relative to the sales by pump-in Honda dealers. T.I.W.'s sales in its RMA are still a bit above the national Honda market penetration average, but this is not a reasonable benchmark for comparison given the strong historical preference of MSP customers for Honda automobiles.

The statute focuses on "adequate market penetration and representation" and states that "good cause shall not be shown solely by a desire for further market penetration." In the present case, T.I.W. has provided adequate market penetration only by comparison to national Honda averages and by comparison of pump-in sales rates in its RMA to pump-in rates throughout MSP. On the other hand, American Honda has shown that its market penetration here has declined over the last few years and that the pump-in rates are abnormally high. American Honda no doubt has a desire for further market penetration, which would not, of itself, be sufficient to establish good cause. But its rationale for establishing the new dealer is more a matter of "keeping up with the Joneses [Toyotas]" and sustaining historic Honda sales rates in MSP (including T.I.W.'s RMA), than simply further market penetration. The statute does not provide a geographic delimitation for determining adequate market penetration and representation. The court finds that, whether limited to T.I.W.'s RMA or considered in MSP as a whole, this factor supports the establishment of the new dealership.

*(f):* Expert testimony showed that the establishment of an additional dealership would increase both inter-brand and intra-brand competition and therefore would be in the public interest. A new Honda deal-ership in Burnsville would compete with the Toyota and Nissan dealerships already operating in that auto area; since it would be closer to potential customers in that part of Dakota County it would provide the public with more choice and, given the price elasticity of new cars, lower prices. By providing more convenient service to potential Honda customers in that area, it would provide an additional factor inclining new cars buyers there to choose Honda.

Eugene Backer, general manager of T.I.W., testified that inter-brand competition has been intensifying. T.I.W. faces a new Acura dealer across the street and a new nearby Hyundai dealer. Consumers are more cautious and more interested in quality. In this atmosphere, inter-brand competition would be improved by the establishment of the new Honda dealership and the public would benefit.

An additional dealership would also increase competition among Honda dealers. There is extensive cross-sell among the four existing MSP Honda dealers; an additional dealer would provide competition throughout the MSP market. An additional dealer would also compete with the many pump-in dealers. This would be direct competition by taking sales opportunities from pump-in dealers, and indirect competition by spurring all MSP Honda dealers to compete more aggressively for local sales. The court finds that an additional new motor vehicle dealership would increase competition and would therefore be in the public interest.

*(g):* The number and rate of household growth in the northern and southern sections of T.I.W.'s RMA were discussed above. Both T.I.W. and American Honda focused on household statistics instead of population statistics (the latter being specified in the statute) because household numbers are a better indication of new car purchasers than population numbers. The household numbers show that the northern part of the RMA is increasing more slowly than the southern part, but that the north maintains a large advantage over the south as a market.

As to new car registrations in the RMA, the statistics show that the new car industry is cyclical. It has been suffering from recession over the last couple years. From 1986–90, total import registrations declined 19.1% in the northern half of the RMA and 1.7% in the southern half. It was a particularly good year for sales in 1986, however, and particularly poor in 1990. The new car industry is expected to recover from its present weaker condition in one to three years. A new dealership would take about one year for its new car sales department, and three to five years for its service and parts departments to firmly establish themselves. During startup, which coincides with an expected economic and new car sales recovery, a new dealership would be at a competitive disadvantage compared with the existing Honda dealerships.

The court finds that the growth in households and the pattern of new car registrations supports establishing a new dealership in Burnsville.

*(h):* As noted above, within its RMA, T.I.W. generally provides stable, adequate, and reliable sales and service to Honda purchasers in its RMA as compared with MSP averages. The court finds that the proposed new dealership would not significantly reduce T.I.W.'s capacities in these areas. Furthermore, the new dealership would increase the convenience of sales and service to Honda purchasers in the southern part of the RMA. This factors supports the establishment of the new dealership.

*(i):* The court finds that the proposed new dealership would not reduce the stability of T.I.W. The reasons for this, including T.I.W.'s resources and historic profitability, have already been discussed.

Weighing these factors as a whole, the court finds that there is good cause under all the existing circumstances to permit the establishment of the proposed new Honda dealership in Burnsville.

All of the factors listed in Minn.Stat. § 80E.14, subd. 2, as well as other relevant factors, should be considered in combination to determine whether there is good cause to permit the establishment of the new dealership. *Northside Lincoln Mercury, Inc. v. Ford Motor Co.*, 603 F.Supp. 2 (D.Minn.1983), *aff'd*, 742 F.2d 451 (8th Cir. 1984); *Wilkins Dodge, Inc. v. Chrysler Corp.*, 426 N.W.2d 903 (Minn.Ct.App.1988), *rev. denied.* The court, having considered the evidence produced at trial in connection with each of the statutory factors and having found that good cause exists, concludes that the proposed new dealership should be permitted to be established.

## ORDER FOR JUDGMENT

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that judgment on the complaint be entered in favor of the defendant. Each side shall bear its own costs.