**GALLO MOTOR CENTER CORP., Plaintiff**

v.

**MAZDA MOTOR OF AMERICA, INC., Defendant.**

No. CIV.A.01–40157–NMG.

United States District Court, D. Massachusetts.

May 15, 2002.

---

Richard B. McNamara, Gregory A.O.OO Holmes, Wiggin & Nourie, P.A., Manchester, NH, for Plaintiff.

John R. Skelton, William F. Benson, Bingham Dana, Boston, MA, Elizabeth M. Leonard, Wiggin & Nourie, Manchester, NH, for Defendant.

## MEMORANDUM OF DECISION

GORTON, District Judge.

This case concerns the balancing of automobile dealers' rights with the prerogatives of the free market. The Great and General Court of the Commonwealth of Massachusetts tried to strike such a balance when it enacted M.G.L. c. 93B, which regulates the relationship between manufacturers and dealers. Chapter 93B, the so-called "Dealer's Bill of Rights", specifically purports to have the dual but sometimes discordant aims of protecting dealers from arbitrary practices of a manufacturer and promoting consumer welfare.

Pursuant to M.G.L. c 93B § 4(3)($l$), the plaintiff, Gallo Motor Center Corporation ("Gallo"), owner of a Mazda dealership lo-cated in Worcester, Massachusetts, contests the establishment of a new Mazda dealership on Route 9 at Walnut Street in Shrewsbury, Massachusetts. The gravamen of the plaintiff's complaint is that the decision of the defendant, Mazda Motor of America, Inc. ("Mazda"), to establish the new dealership was arbitrary and, as a consequence, in violation of Chapter 93B. Gallo seeks, *inter alia*, damages to compensate it for lost profits and diminution in franchise value.

On November 5, 2001, this Court allowed, in part, and denied, in part, Mazda's motion for a speedy trial pursuant to M.G.L. c 93B § 4(3)($l$)(3), and set an expedited trial schedule. On March 7, 2002, the Court denied Mazda's motion for summary judgment and three weeks later conducted a five-day bench trial and heard oral arguments. After taking the matter under advisement, this Court finds for the defendant.

### I. *Findings of Fact*

#### A. Gallo's Purchase of its Mazda Dealership

In 1994, Gallo acquired an existing Mazda dealership located at 235 Shrewsbury Street in Worcester. In connection with Mazda's approval of Gallo as a Mazda dealer, Gallo agreed to relocate the combined Mazda/Volvo dealership to Goldstar Boulevard in Worcester. When it commenced business in the new facility on Shrewsbury Street, Gallo also owned and operated separate Saturn, Mitsubishi and Oldsmobile dealerships in Worcester.

At the time Gallo purchased the Mazda dealership, the Worcester area was a highly competitive market for automobile sales and Gallo was aware that there were other Mazda dealerships in close proximity, including the Roy Rioux dealership in West-borough, 7.6 miles from Gallo's Shrews-

bury Street site. After reviewing the market opportunity, Gallo's management determined that it was a sound business decision to purchase the Mazda franchise notwithstanding the vigorous competitive environment.

### B. The Mazda Franchise Agreement and Sales Benchmarks

When a dealer acquires a Mazda franchise, Mazda assigns to it a non-exclusive geographic area called a Statistical Observation Area ("SOA") corresponding to specific zip codes or census tracts. Mazda measures a dealer's performance by comparing new vehicle registrations in its SOA with industry-wide benchmarks, such as Mazda's national market share. Gallo's SOA consisted of all of Worcester and Shrewsbury.

Pursuant to the express terms of its dealer agreement, Gallo represented Mazda with respect to sales, service and marketing in its assigned SOA. Gallo, however, did not have a proprietary right to its SOA which Mazda stipulated could be adjusted. At the time Gallo purchased the Mazda franchise, the sales record for Mazda cars in the Worcester–Shrewsbury SOA was well below the national and regional average. Mazda attributed that sluggish record, at least in part, to the poor location of the Shrewsbury Street dealership. Mazda also believed that it had a deficient market share in the neighboring Westborough SOA.

#### 1. The 1997 Worcester Market Study

In 1997, Mazda retained Urban Science Application, Inc. ("USAI") to conduct major market studies of 84 metro market areas across the country, including the greater Worcester region. The USAI study was part of Mazda's program for national dealer revitalization, a project in which Mazda sought to eliminate poor performing dealerships while maximizing the efficiency of its remaining dealerships.

USAI issued a report, the "1997 Worcester Area Market Study", based upon market data from 1994 through 1997. The report recommended, *inter alia,* that 1) the greater Worcestser area should have three dealerships, 2) the overall Worcester market area was not performing at an optimal level and 3) for Mazda to achieve its expected market share, the three existing dealerships had to attain superior sales and service records.

#### a. The Closure of the Roy Rioux Dealership

In the years preceding 1998, the performance of the Roy Rioux Mazda dealership was steadily declining. In 1998, that dealership officially ceased operations after being unable to find a buyer acceptable to Mazda and shortly thereafter, Mazda began to search for a replacement dealer. Mazda did not commission a new study to determine whether it should fill the "open point" (i.e., an area where there is a potential market opportunity for a new dealership). However, the 1997 Worcester Area Market Study, R.L. Polk vehicle registration penetration information and Mazda's own sales and demographic data, among other things, convinced Mazda that a new Route 9 dealership would enable it to achieve greater market penetration in the Westborough area.

#### b. Gallo's Relocation to Goldstar

During that same period, Gallo, pursuant to its initial agreement with Mazda, was in the process of moving its Mazda/Volvo dealership facility from its Shrewsbury Street location to its present site at 70 Gold Star Boulevard in Worcester. Although the combined cost of the move of the dual franchise was substantial and the relocation not without problems,

the new dealership site, as both Gallo and Mazda recognized, improved Gallo's position in the market. During the first few months following the relocation in May, 1999, however, Gallo experienced a major disruption in its business operation and its sales and customer satisfaction rating ("CARE scores") declined.

## 2. New Opportunities in the Westborough SOA

With the dissolution of the Rioux Mazda dealership and Gallo's initial relocation problems, Mazda's market performance in the Westborough SOA continued to be unsatisfactory. Although a new Westborough franchise was not immediately arranged, Mazda openly searched for potential dealers. During its regular regional advertising group meetings, Mazda's representatives expressed their intention to fill "open points", including the Westborough site.

### a. The MetroWest Proposal

In late 1998, Mazda agreed to a proposal from Lincoln–Mercury to establish a joint Lincoln–Mercury/Mazda dealership (hereinafter "MetroWest") on Route 9 under the auspices of the Ford Dealer Development Program. When Mazda began to consider that proposal seriously, Lincoln–Mercury was well into the planning phases for closing a Worcester site and opening "MetroWest" in Shrewsbury.

### b. Mazda's 1999 Notice to Gallo

By 1999, after canvassing the Westborough and Shrewsbury area, Lincoln–Mercury, with minimal assistance from Mazda, identified the intersection of Route 9 and Walnut Street (in Shrewsbury) as the site of a potential dual dealership. At that time, a Mazda representative notified Nicholas Gallo, an owner of Gallo Mazda, that he would soon receive written notifica-

tion that Mazda intended to establish a new dealership on Route 9 adjacent to a well-known store. Mazda did not, however, inform Mr. Gallo that the site of the new dealership was in Shrewsbury and Mr. Gallo, on his part, made no inquiries with respect to its precise location.

On August 16, 1999, Mazda notified Gallo by certified mail of its intention to establish a new Mazda dealership "at the Southwest corner of Route 9 and Walnut Street in Westboro, Massachusetts." Mazda further advised Gallo that it anticipated that the new dealership would begin operation in January, 2000 or shortly thereafter. Although that notice provided Gallo with the correct street address of the proposed Route 9 dealership, it inaccurately identified the site as being in Westborough rather than Shrewsbury.

At the time he received Mazda's written notice, Nicholas Gallo understood that, pursuant to the protest procedures of Chapter 93B, his dealership was required to notify Mazda of its intent to sue within 30 days of receipt of the letter. Based upon the notice letter, Gallo assumed that the new dealership would, in effect, replace the Rioux franchise in Westborough, although, because of its distance from the former dealership and the time interval between the Rioux closing and the notice, it was not a "replacement dealership" as that term is defined in the statute.

The day after receiving the notice letter, Nicholas Gallo conferred with his business associate, Alfred Gallo, and they agreed that they would not protest the establishment of the new dealership because Westborough was sufficiently distant from their dealership to give Gallo "enough space to compete equally." Gallo did not then find the prospect of three dealerships in the greater Worcester area to be *per se* objectionable.

### 3. The Opening of the MetroWest Site

With no pending protests against the MetroWest dealership, Mazda began construction on the site in 1999 and, in late 2001, it opened for business. The new dealership, a $3.8 million facility, is located 6.5 miles from Gallo's Goldstar Boulevard location.

#### a. Gallo's Subsequent Dialogue with Mazda

In March, 2001, Gallo first learned that the MetroWest dealership is in Shrewsbury. That same month, Nicholas Gallo informed Ronald Wysong ("Wysong"), then Regional General Manager for Mazda, that 1) he was concerned that the new dealership was to be in Shrewsbury rather than Westborough, 2) he did not understand why Mazda would open such a nearby franchise given his recent strong sales and service performance, and 3) he viewed the opening of the new dealership to be a poor business decision because its location was not optimal.

During 2001, Gallo's business showed new signs of strength. At the time Mr. Gallo learned of the Shrewsbury site, his dealership had recovered from its initial operational problems arising from the relocation and it actually posted a profit. The Goldstar location was a marked improvement and, because of the facility, and dramatically increased sales, Gallo qualified as a leading Mazda dealer.

#### b. The Allison Associates Report

As part of a larger effort to improve dealer profitability, Mazda hired Allison Associates ("Allison") in May, 2001, to evaluate Gallo's operations and to write a report with its recommendations. Gallo was one of a small number of dealers to participate in such an evaluation. After talking to Gallo personnel and reviewing its financial data, Allison performed a comprehensive analysis of the entire Gallo Mazda operation and made numerous recommendations, some of which were implemented.

Allison's onsite consultant, Art Starr ("Starr"), initially stated in a draft report that Mazda need not add another dealer to the Worcester area. When Mazda received that draft, its Regional Manager contacted Allison to complain that Starr's comment was gratuitous, lacked a solid statistical foundation and was inconsistent with market studies commissioned by Mazda. Because Allison agreed that Starr's opinion was beyond the scope of its assignment, it directed him to remove the recommendation from the report. Starr did so after acknowledging that it was unsupported by his own market research. There is no credible evidence that the comment was removed in anticipation of litigation.

### 4. The Commencement of the Instant Suit

On June 21, 2001, Gallo sent a letter to Mazda challenging its establishment of the Shrewsbury dealership and failure to provide Gallo with adequate notice. In response, on July 13, 2001, Mazda sent Gallo a corrected notice letter and one week later, Gallo informed Mazda by letter of its intent to sue. The present lawsuit followed.

## II. *Conclusions of Law*

### A. Regulation of Automobile Business Practices Under Chapter 93B

■ Chapter 93B was enacted to address some of the risks associated with unrestrained competition in the automobile industry. The statute protects existing dealers' investments by prohibiting automobile manufacturers from adding dealerships in the market area of an existing

franchisee "where the effect of such intra-brand competition would be injurious to the existing franchisees and to the public interest." *New Motor Vehicle Board of California v. Orrin W. Fox Co.*, 439 U.S. 96, 102, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978)(construing an analogous California statute).

It is, however, often overlooked that Chapter 93B addresses not only dealers' rights but also consumer welfare. M.G.L. c. 93B, §§ 4(1) & (4). While there are certain points of commonality between the interests of the public and existing dealers, there is, of course, an inevitable tension. The public interest "will favor increased competition in most circumstances, where the existing dealers' interests may be opposite." *American Honda Motor Co., Inc. v. Bernardi's. Inc.*, 432 Mass. 425, 432–33, 735 N.E.2d 348 (2000)(hereinafter *"Bernardi's "*). Chapter 93B seeks to establish an equitable balance by, on the one hand, placing limits on the ability of manufacturers to open new franchises and, on the other hand, making consumer welfare a substantive part of a court's analysis under the statute.

**B. The Notice Requirement**

In order to protect franchisees, Chapter 93B prohibits manufacturers from granting new franchises "arbitrarily and without notice to existing franchisees." M.G.L. c. 93(b)(4)(*1* ). Although Chapter 93B sets forth factors that bear upon a court's determination of arbitrariness, it is silent as to what constitutes adequate notice. Chapter 93B § 4(3)(*1* ) articulates only the following broad procedural requirements that:

> Any manufacturer, distributor, wholesaler, distributor, branch or division, factory branch or division or wholesale branch or division which intends to grant or enter into an additional franchise or selling agreement, shall, at least *sixty days* prior to granting such franchise or entering into such agreement, give *written notice* of its intention to do so to each motor vehicle dealer with a franchise or selling agreement covering the same line make *within a twenty mile radius of the location where the business of the proposed franchise will be located. Such notice shall state the date on or after which such proposed franchise shall be granted or entered into.*

M.G.L. c. 93B § 4(3)(*l* ) (emphasis added). Chapter 93B requires no more of a manufacturer than that it state the proposed location of the new franchise and the date on which it will be established.

Chapter 93B likewise protects a manufacturer's interest, and in some cases investment, by requiring a dealer who intends to protest to submit "written notice of its intention to do so to such manufacturer . . . within thirty days from the date on which it received notice of such intention to grant or enter into the additional franchise or selling agreement." M.G.L. c. 93B § 4(3)(*1* ). A dealer's obligation to notify a manufacturer of its intent to protest the grant of a new franchise is prompted by its receipt of sufficient written notice from the manufacturer.

**1. Mazda's 1999 Notice Letter**

Pursuant to Chapter 93B, Mazda attempted to give Gallo notice in March, 1999 of its intention to establish a new franchise on Route 9 at the Walnut Street intersection (which Mazda identified as being in Westborough). Notwithstanding the fact that the letter did not include a correct address, Mazda's letter had sufficient information to enable Mr. Gallo, a lifelong resident of the area whose business depended upon a working knowledge of local demographics, to investigate the

location of the proposed dealership if he so chose.

Although Mazda correctly identified the Walnut Street intersection on Route 9, its designation of Westborough rather than Shrewsbury was, according to Gallo, a mistake that made all the difference. Mr. Gallo believes that Westborough is separated from Shrewsbury by more than distance, and he testified that if he had been aware that the new dealership was to be in Shrewsbury, the proximity to Westborough notwithstanding, Gallo would have availed itself of the statutory protest procedures. It claims that, from a dealer's perspective, the town in which the dealership is to be located, rather than its exact address, is the decisive, determining factor in whether to challenge a new franchise. Indeed, Gallo is supported, in this instance, by limited, relevant precedent that a manufacturer need only name the town of the new dealership to satisfy the notice requirements of Chapter 93B. *Boston Car Co., Inc. v. Acura Auto. Div., American Honda Motor Co.*, 971 F.2d 811, 816–17 (1st Cir.1992).

### 2. The Sufficiency of Mazda's First Notice

■ From the outset, neither Mazda nor Gallo complied with the statutory requirements and, as a consequence, the notice issue depends upon which party had the initial burden to convey information. Mazda's first written notice was wrong with respect to a key fact. Gallo's reliance (or lack of reliance) on that notice is central to the instant dispute. Perhaps Gallo should have been more diligent when it received Mazda's written notice but Mazda, which had the burden of providing adequate notice, failed to do so.

Under Chapter 93B, notice is a procedural device that depends on content and delivery. Here, the content was significantly flawed and thus inadequate under Chapter 93B. Notably, that statute imposes no affirmative obligation on the dealer to investigate a proposed dealership nor a requirement on the manufacturer to offer a detailed disclosure in its notice letter. Rather, it merely sets forth rules governing the timing of notice and intent-to-sue letters.

In the absence of clear statutory direction, the larger objectives of Chapter 93B to "protect franchisees from having to succumb to dictation by manufacturers pressing their own interests" is relevant. *Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc.*, 376 Mass. 313, 322, 381 N.E.2d 908 (1978). Mindful of that judicial teaching, Mazda possessed the pertinent information about the new franchise and a corresponding obligation to ensure that its notice was neither deficient nor in any way misleading.

This Court concludes that the notice given by Mazda on August 16, 1999 was defective and inadequate. Its subsequent letter of July 13, 2001 was, therefore, the effective statutory notice pursuant to Chapter 93B. Gallo's letter of July 20, 2001, informing Mazda of its intent to protest, consequently, complied with M.G.L. c. 93 § 4(3)(*1*).

### C. Arbitrariness

■ Similar to its counterparts in other states, Chapter 93B commonly places some limits on intrabrand competition, including limitations on a manufacturer's ability to open new dealerships in an area already served by an existing dealer. *See, e.g., Future Ford Sales, Inc. v. Public Service Com'n of State of Del.*, 654 A.2d 837 (Del. 1995), *aff'd*, 1996 WL 291106 (Del.Super.Ct.1996), *aff'd*, 692 A.2d 412 (Del.1997). A manufacturer may open a new dealership in the relevant market area of an operating franchisee so long as that "add

point" is not arbitrary. Although "arbitrariness" is not precisely defined, courts interpreting the term usually consider whether the new dealership will "impinge economically" on the existing dealership and the needs, in terms of both sales and service, of the consuming public. *Richard Lundgren, Inc. v. American Honda Motor Co., Inc.*, 45 Mass.App.Ct. 410, 412, 699 N.E.2d 11 (1998), *review denied* 428 Mass. 1107, 705 N.E.2d 278. The contesting dealer must demonstrate, by a preponderance of the evidence, that the manufacturer's appointment of a new dealership is arbitrary. *Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc.*, 14 Mass. App.Ct. 396, 416, 440 N.E.2d 29 (1982).

Specifically, Chapter 93B lists eight nonexclusive factors meriting particular attention: i) the economic justification for the new franchise, (ii) the record of the objecting dealer, and other dealers in the area, in exploiting the relevant market, (iii) the investment in their franchises of the objecting dealer and other dealers in the relevant market area, (iv) the permanency of the investment of such dealers in the relevant market area, (v) whether the proposed dealership serves the public interest, (vi) whether such dealers provide adequate competition and convenient consumer care, (vii) whether such dealers offer satisfactory facilities, equipment, vehicle parts and qualified personnel, and (viii) whether the establishment of an additional franchise would increase competition and therefore be in the public interest. M.G.L. c. 93B § 4(3)(*l*)(i)-(viii).

■ The factors constituting the calculus of arbitrariness are neither exhaustive nor definitive. The statute pointedly directs a court to "consider all pertinent circumstances." *Id.* By implication, courts need not perform a mechanical analysis of all the elements that may have bearing upon whether the establishment of a proposed dealership is arbitrary. Common sense, experience and expert opinion may properly serve as guideposts in this Court's arbitrariness analysis.

### 1. Economic and Current Market Conditions

Worcester, just now the third largest city in New England, is home to a significant number of households. Although not expanding at the same rate as other regions, the greater Worcester area has, nonetheless, demonstrated steady growth over the past five years.

The market for new and used automobile sales in greater Worcester is also robust. From 1996 through June, 2001, the number of vehicle registrations of Mazda and its competitors increased at a rate substantially above the national average. Given the relative resiliency of automobile market during the past year, Mazda and vehicles in its competitive set have significant market opportunities in the area.

As its substantial investment in its dealership facility indicates, Gallo recognizes that the Worcester market has significant potential. A 2001 market analysis relied upon by Gallo to make marketing decisions indicates that well over 100,000 adults in the greater Worcester area plan to purchase used or new vehicles in 2002. Mazda's expert similarly testified that there will continue to be positive demographic trends in the region, signaling expanding market opportunities.

### 2. Area to Be Served and the Performance Record of the Greater Worcester Area Dealership Network

Automobile manufacturers, including Mazda, aim to increase sales volume and market share in each region in which they are represented. In that regard, each manufacturer is acutely aware of its direct

competitors and how it stands in relation to them. One approach to measure market performance is to compare the market share of the manufacturer in question to its direct competitors in the region.

### a. Performance of the Worcester Area Mazda Dealerships

Although experts continue to debate the proper performance benchmark, it is clear that Mazda's sales performance in the Worcester–Shrewsbury SOA was inadequate from 1998 to the present. Moreover, Mazda was not performing at expected levels in the area immediately adjacent to Gallo's SOA. After the Roy Rioux Mazda dealership, a poorly performing franchise, closed in 1998, there was an "open point" in adjoining Westborough and Mazda predictably saw its sales volume fall there.

At the same time, Gallo, hindered by a poor facility and an imminent relocation, was unable to take advantage of the closing of the Rioux Mazda dealership. Although Gallo's sales improved in 1998, its performance nevertheless fell off again in 1999. The experts for Gallo and Mazda agree, in fact, that Gallo's historic sales performance has consistently failed to meet Mazda's expectations, whether measured against regional or national benchmarks. *Cf. Armstrong Buick, Inc. v. General Motors Corp.*, 597 F.Supp. 932, 933–34 (D.Or.1984)(utilizing a regional benchmark).

It was not until Gallo moved to the Goldstar location and addressed initial operational difficulties that its sales levels increased steadily. The most significant factor contributing to Gallo's stronger performance in 2000 was not the absence of a Westborough dealership (although that certainly helped) but rather on Gallo's new facility and more convenient location.

### b. Gallo's Recent Performance Record

Notwithstanding the fact that Gallo's sales have improved since its relocation to the Goldstar facility, they have been below what Mazda expected, based upon the national and regional averages from 1998–2001. Gallo's performance has been even less impressive if the Westborough open point is considered a relevant circumstance bearing upon Gallo's market opportunity.

Although Gallo has not historically met Mazda's benchmarks, its success in the new facility suggests continued improvement as its business operations and marketing strategy is refined. As Chapter 93B makes plain, however, the issue of whether a new dealership is warranted is not dependent on raw sales but rather on how Gallo performed relative to the business available in its market area. To that end, Gallo's sales record, while improving, could reasonably be deemed to be less than satisfactory. Mazda's regional performance has declined since the closure of the Roy Rioux dealership and, consequently, Mazda has not captured what it reasonably foresees as its appropriate market share in the Worcester–Shrewsbury area. *Cf. Northside Lincoln Mercury, Inc. v. Ford Motor Co.*, 603 F.Supp. 2, 5 (D.Minn.1983)(discussing how, after the closure of a franchise, a manufacturer's decreasing market penetration supports the appointment of a new dealership).

### 3. The Investment Made by Gallo and Other Competing Dealers

The record is clear that Gallo has made a substantial, permanent investment in its facility, goodwill and personnel. When Gallo became a Mazda dealer in 1994 it concurred with Mazda that a new facility was necessary to achieve a stronger sales record. To that end, Gallo incurred substantial costs in the process of moving to

the Goldstar location. Its investment, however, was not in vain and its sales volume has increased dramatically.

### 4. Consumer Welfare

Whether or not the appointment of a new dealership is arbitrary also depends on whether the existing dealership network is sufficiently serving the needs of the public. Chapter 93B specifically directs courts to consider whether the objecting dealer and the existing dealership network is, *inter alia*, providing 1) adequate competition, 2) customer care, 3) sales and services facilities, 4) equipment, 5) vehicle parts and 6) personnel to provide for the reasonable needs of the consumers in the relevant market area.

The addition of MetroWest returns the Mazda dealer network in the greater Worcester area to three, the same number of dealers when Gallo purchased the Mazda franchise. Indeed, before it was approached by Lincoln–Mercury, Mazda had been actively seeking out a new dealer to fill the Westborough "open point" to bolster its sales in the region. Mazda did not, however, commission a study on the proposed site in Shrewsbury pursuant to Chapter 93B nor does the statute require such a new market analysis. Rather, Mazda relied upon its relatively weak performance in the Worcester region, the R.L. Polk data and the 1997 Market Study to justify the establishment of the MetroWest dealership.

### a. The Market Dynamics of the Route 9 Corridor

In terms of competition in Central Massachusetts, a presence on Route 9 is apparently quite important to most dealers. Notably, several of Mazda's direct competitors, including Toyota and Nissan, have dealerships both on Route 9 in Westborough and at another site in Worcester. Indeed, there are approximately 12 dealerships along the Route 9 corridor, not including Mazda.

Because of this concentration of dealerships, Route 9 is a convenient place for consumers to shop for and service automobiles. *Cf. T.I.W., Inc. v. American Honda Motor Co.*, 808 F.Supp. 1399, 1402–03 (D.Minn.1992)(discussing the "auto row" phenomenon and customer convenience). A Mazda customer living in the Westborough SOA (before MetroWest) had to travel approximately ten miles to reach the nearest Mazda dealership, a distance that, while not excessive, is nonetheless greater than the distance to most of Mazda's competitors. *Cf. Armstrong Buick, Inc.*, 597 F.Supp. at 934 (noting that "proximity favorably affects dealer sales"). Mazda was not unreasonable in concluding that a dealership on Route 9 would promote customer convenience.

### b. The Impact of MetroWest on Consumers

Although Mazda certainly benefits when it becomes easier to purpose and service its vehicles, convenience is not the overarching purpose of Chapter 93B. Rather, in determining arbitrariness, the question is whether a new dealership will benefit consumers without unduly threatening the investment of an operating dealer. *Bernardi's*, 432 Mass. at 432–33, 735 N.E.2d 348; *Tober Foreign Motors, Inc.*, 376 Mass. at 319, 381 N.E.2d 908.

Here, Gallo has shown that its new service facility, equipment, parts and personnel adequately serve its SOA. As part of Gallo's relocation to Goldstar Boulevard, in fact, it leased an adjacent building to house its service facility. In order to ameliorate its customer satisfaction index ("CSI scores"), Gallo also hired a Service Manager. After those adjustments, Gallo's CSI scores improved significantly, thus posi-

tioning Gallo as a top performer among regional Mazda dealers.

The thorny question is, however, whether Mazda's existing dealership network, without the MetroWest site, adequately serves the Westborough area in terms of competition, sales, service and facilities. By expanding the number of Mazda dealerships, customers will have greater access to equipment, vehicle parts and qualified personnel but it is unclear whether the current dealership network adequately serves those customers.

The market for automobiles is unpredictable and manufacturers and dealers must navigate an uncertain course. The decision of most of Mazda's competitors to have franchises in both Worcester and along Route 9 in Westborough is a compelling indicator. The MetroWest site, while just over the town line in Shrewsbury, puts Mazda in a similar position to its closest competitors. *See T.I.W., Inc.,* 808 F.Supp. at 1402–03.

## 5. The Adequacy of the Existing Dealer Network

It is beyond cavil that competition, in most circumstances, benefits the consuming public. As a general matter, consumers profit from the ability to comparison shop between dealers and brands. A Mazda dealership in close proximity to several other dealerships promotes interbrand and intrabrand competition which ultimately reduces prices while expanding sales and service options. *Cf. id.* at 1404 (observing that, given "the price elasticity of new motor vehicles" competition improves consumer welfare by lowering prices).

There is, of course, a saturation point. If prices consistently fall below marginal cost, dealers go out of business and customers are harmed because options for sales and service facilities then decrease while prices rise. Where the impact of a new dealership diminishes an existing dealer's profits so severely as to cause a substantial deterioration of customer services, the establishment of the such a dealership is likely to be arbitrary. *Monmouth Chrysler–Plymouth, Inc. v. Chrysler Corp.,* 102 N.J. 485, 509 A.2d 161, 168 (1986).

Although MetroWest only recently commenced business, competition between it and Gallo has already begun to encourage consumers to comparison shop. The selling price of many Mazda vehicles at Gallo, as a consequence, has decreased. Despite Mazda's suggestions to the contrary, because of increased competition, Gallo will in all likelihood lose some business to MetroWest, which has a state-of-the-art facility and presumably more marketing dollars.

Although the prognosis for Gallo may, at first, seem problematic, there are mitigating factors. With several established interbrand dealerships in the Worcester area, the Gallo name has currency. The owner of MetroWest, in contrast, neither lives in the area nor has the same established goodwill.

Moreover, the number of Mazda customers in the Worcester area is not fixed. Aggressive marketing efforts can and ought to attract customers of other brands. The fact that Mazda's sales volume in the Worcester region falls below its national average underscores the opportunity for Mazda to expand its market share.

The MetroWest dealership is actively promoting the Mazda trademark and advertising in the greater Boston and Worcester areas in order to expand Mazda's customer base. Gallo's sales should benefit from the goodwill associated with that marketing effort and from any increase in customer traffic from MetroWest. Gallo has leased billboard space adja-

cent to the MetroWest site to encourage customers to visit Gallo Mazda as well. Customers, in turn, should benefit from more choices and information on Mazda vehicles.

### 6. Lost Profits

Gallo contends that competition from MetroWest will inevitably diminish its profits and seeks damages therefor. Chapter 93B, however, does not explicitly contemplate an existing dealer's lost profits as a substantive consideration, *Cf. Armstrong Buick* 597 F.Supp. at 933, although this Court may consider them in connection with its determination of arbitrariness.

Invariably, when a manufacturer adds a new dealer to a market, the protesting dealer offers evidence of injury to its sales and profits. *Cf. Ricky Smith Pontiac*, 14 Mass.App. at 423, 440 N.E.2d 29; *Monmouth Chrysler–Plymouth*, 509 A.2d at 169. Lost profits alone does not render the establishment of a new dealership arbitrary. Such a rule "would have the practical effect of prohibiting the franchising of any new automobile dealers within [the relevant market area] of an existing franchisee..." *Monmouth Chrysler–Plymouth, Inc.*, 509 A.2d at 169; *accord McLaughlin Ford v. Ford Motor Co.*, 192 Conn. 558, 473 A.2d 1185, 1192 (1984) (noting that evidence of decreased sales volume due to increased intrabrand competition inadequate to support action under Connecticut Unfair Trade Practices Act). The existing dealer has the burden of demonstrating that its lost profits will lead to a tangible decline in its ability to adequately serve its customers. *See Ricky Smith Pontiac, Inc.*, 14 Mass.App.Ct. at 416, 440 N.E.2d 29.

In the instant case, Gallo may experience some decline in its profits, or at least in its profit margin, but with so many market factors implicated, the impact of the MetroWest dealership on Gallo's business in the long term is by no means certain. As of Spring 2001, the Allison Associates Report described Gallo's gross profits as "very healthy".

Gallo has apparently adjusted to the threat of competition by making its operations more efficient, its personnel more effective and its facility more attractive, and, in the process, has become qualified for additional incentives and discounts as an "elite dealership". Gallo has not, therefore, shown that the existence of MetroWest will render it unprofitable or unable to earn a reasonable return on its investment.

Moreover, despite his protest of MetroWest, Mr. Gallo recognizes that the greater Worcester area is sufficiently robust to support the addition of another Mazda dealership. He has consistently voiced no objection to the introduction of a dealership in Westborough, the Town in which the Roy Rioux dealership was located, because it is sufficiently removed from his dealership to pose little competitive threat. MetroWest is, however, less than one half mile from the Westborough town line, and although not dispositive, the distance between Gallo and MetroWest is only one mile closer than the distance between Gallo's Shrewsbury Street site and the former Roy Rioux Mazda dealership. Notwithstanding the perceived difference between Shrewsbury and Westborough, Gallo's lack of concern about a Westborough competitor seriously undercuts his claim that Mazda's decision to establish MetroWest was arbitrary.

### 7. Competition and the Public Interest

Chapter 93B explicitly equates competition with the public interest. M.G.L. 93B § 4 (*l*)(viii). The market for automobiles is more robust, information more readily available to consumers and dealers more

efficient when there is healthy competition. In the instant case, MetroWest will increase competition, expand the available sales and service options and tend to decrease prices. In short, the establishment of the MetroWest will promote the public interest.

### III. *Conclusion*

Chapter 93B limits intrabrand competition by prohibiting the arbitrary establishment of a new dealership. Here, Gallo has not sustained its burden of demonstrating that Mazda's establishment of the MetroWest dealership is arbitrary. To the contrary, Mazda's appointment of a new dealership in Shrewsbury promotes competition which, in turn, benefits the public interest. Judgment will be entered for the defendant.

**So ordered.**